Robert Lee BAKER, Curtis Baker, Lisa Clow and Darin Baker, Plaintiffs/Respondents,

v.

Joaquin R. GUZON, M.D., Defendant/Appellant.

No. 69887.

Missouri Court of Appeals, Eastern District, Division Four.

July 22, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 26, 1997.

Application to Transfer Denied Sept. 30, 1997.

Doreen G. Powell, Robyn G. Fox, St. Louis, for defendant/appellant.

Thomas C. Hullverson, Philip C. Denton, St. Louis, for plaintiffs/respondents.

SIMON, Judge.

Joaquin R. Guzon, M.D. (Guzon) appeals from a judgment entered on a jury verdict in the Circuit Court of the City of St. Louis awarding Robert Lee Baker, Curtis Baker, Lisa Clow, and Darin Baker (collectively Bakers) damages of $829,500 for the wrongful death of Betty Baker (wife), wife of Robert Lee Baker (husband) and mother of Curtis Baker, Lisa Clow, and Darin Baker. St. Anthony's Medical Center, also a defendant, settled on the morning of trial.

On appeal, Guzon contends that the trial court erred in (1) overruling his motions for directed verdict and for judgment notwithstanding the verdict because Bakers failed to make a submissible case of wrongful death by failing to present evidence establishing a causal relationship between Guzon's alleged conduct and wife's death; (2) permitting Bakers to submit the case to the jury under Instruction Number Seven because each disjunctive submission contained in the instruction was not supported by substantial evidence that but for (a) Guzon's alleged failure to timely diagnose wife's infection, she would not have died; (b) Guzon's alleged failure to

timely examine wife, she would not have died; (c) Guzon's alleged failure to timely order intravenous antibiotics, she would not have died; and (d) Guzon's alleged failure to timely obtain surgical consultation, she would not have died; and (3) finding that, under section 538.220.2 RSMo 1994 (all references hereinafter will be to RSMo 1994 unless otherwise noted), only that portion of the future damages award of $527,100 exceeding $100,000 and payable to an individual plaintiff was subject to periodic payments and entering a periodic payment order that first deducted attorney's fees and expenses from the future damages award and then ordered only two periodic payments to husband. We affirm.

The record, viewed in a light most favorable to the verdict, establishes that on the afternoon of April 20, 1992, wife began to feel "a little sick" and complained to husband. She described her symptoms as flu-like, which included high fever, occasional vomiting, and "achy" joints. At that time, husband also thought he had the flu. Wife requested that husband call her gynecologist and report her symptoms. Her gynecologist prescribed medication to stop the vomiting and recommended that she take Tylenol. She took the Tylenol and her temperature decreased from 103 to 99.

Three days later, wife and husband were feeling better. However, at approximately 3:00 a.m. on April 24, wife awoke and complained to husband of pain in her right armpit. He noticed something on her right hand that "really looked bad." Husband took wife to St. Anthony's Medical Center for an evaluation.

Wife was signed in at the front desk of the hospital at 6:55 a.m. She went to an examination room where a nurse checked her vital signs and took a patient history. Husband reported to the nurse that they had experienced flu-like symptoms earlier that week and noted that they had taken Tylenol.

The nurse called Dr. Rumley, the emergency room physician, to see wife. Dr. Rumley also took a patient history and asked about the pain that wife was experiencing. Wife complained of pain in the right chest area, which pain increased with movement and deep breathing. She went to another examination area for testing which included taking her temperature, an X-ray of her chest, a CBC (complete blood count), and blood gas, electrolyte, and other chemical tests. The tests revealed a normal hemoglobin level, normal hematocrit, and normal white blood cell count. The tests showed that her temperature was 96.8 degrees, that she had a peritracheal and hilar mass in her chest, that her blood contained an elevated amount of immature white cells (described as a "left shift"), and that she had hypoxia (low oxygen saturation). Furthermore, the chemical tests showed "a lot of non-specific elevated findings."

Sometime after 9:00 a.m., Dr. Rumley called Guzon, the physician on call at the time for the emergency department, for consultation and possible admission of wife. When Guzon received the call he was seeing patients at a Med First office where he worked. To serve on St. Anthony's staff, Guzon periodically had to take calls from the emergency room for patients such as wife who do not have an established primary care doctor. Dr. Rumley told Guzon that wife had a peritracheal tumor, which Guzon interpreted as a sign of lung cancer. Additionally, Dr. Rumley reviewed some of the laboratory findings with him.

Guzon asked Dr. Rumley if she saw signs of an infection on wife. Dr. Rumley responded that wife had "a small scratch on the finger" that was "nothing to worry about." Guzon decided to admit wife to the hospital as his patient for further testing. He ordered that wife receive a mammogram and a CAT scan as soon as possible, that she receive medication to relieve her pain, and that she be monitored for heart rate, respiration, temperature, and blood pressure. He planned to go to St. Anthony's to see wife after he completed his office hours at Med First at 8:00 p.m.

At approximately 12:00 noon, Guzon called St. Anthony's and learned that wife was receiving a mammogram in the X-ray department. Wife, however, could not complete the mammogram because she felt acute pain. At approximately 5:20 p.m., a nurse called Guzon to report that wife was complaining of

pain and that the pain medication was not working. Guzon told the nurse to check wife's blood pressure and to give her a shot of morphine sulfate if her blood pressure exceeded ninety. The same nurse soon called Guzon again to report that wife's blood pressure was sixty, that she was sweating, and that the morphine shot had not been given. Guzon told the nurse to call the intensive care unit (ICU) physician and to start an intravenous line (IV) and indicated that he would come to the hospital. He arrived at approximately 7:50 p.m.

When Guzon arrived at the hospital, he learned that wife had been taken to the ICU. He went there and met Dr. Jones, the ICU physician, who told Guzon that wife's blood pressure was low. Guzon then examined her and found that she was "very critically ill" and in "terrible shape." He found that her right hand had "slight redness."

Guzon and Dr. Jones met with an infectious disease consultant and prescribed antibiotics for wife. She received her first antibiotic treatment at approximately 8:35 p.m. Her condition rapidly deteriorated and she died the next morning at 6:30 a.m. An autopsy revealed that she had died from a severe infection caused by group A-beta hemolytic streptococcus bacteria, a virulent bacteria that invades the muscle and produces a toxin that dissolves tissue. This bacteria has been called "flesh-eating bacteria" by the media.

Bakers filed an action for wrongful death as the surviving spouse and children of Betty Baker. In their first amended petition they alleged that she was admitted under the care of Guzon and that Guzon negligently and carelessly failed to observe, examine, diagnose, and begin to treat her for her symptoms until late in the afternoon of April 24, 1992, approximately ten hours after she was brought to the hospital. Furthermore, they alleged that wife died as a direct result of the aforesaid negligence and carelessness of Guzon.

In his answer, Guzon conceded that wife was admitted to the hospital under his care and that she died; however, he essentially denied the allegations that he was negligent and careless and that wife died as a result of any negligence or carelessness on his part.

At trial, Bakers' evidence included the testimony of three expert witnesses, medical doctors Coleman, Crane, and Jacoby. While testifying, each doctor analyzed wife's medical records, the tests that were performed, the results of the tests, and Dr. Rumley's and Guzon's actions. Each doctor made a diagnosis from the available data and was critical of Guzon's handling of the situation. On direct examination, Dr. Coleman testified that Guzon violated the standard of care by failing to timely examine wife, diagnose her infection, order intravenous antibiotics, and obtain a surgical consultation. Also, he testified that patients having wife's illness have a seventy percent chance of surviving and a thirty percent chance of dying, even if they receive prompt surgical and antibiotic therapy, but that wife "more likely than not" would have been in the survival group if Guzon had complied with the standard of care.

On direct, Dr. Crane testified that Guzon violated the standard of care. Like Dr. Coleman, Dr. Crane believed that Guzon failed to timely diagnose wife's illness in that "more information ... and more treatment was needed" when Dr. Rumley first called Guzon. Dr. Crane stated that Guzon should have considered differential diagnoses, of which infection would rank "first on the list." Similarly, Dr. Crane believed that Guzon failed to timely order intravenous antibiotics. According to Dr. Crane, Guzon should have "[gotten] antibiotics started if infection is still high on the list which it should have been." However, unlike Dr. Coleman, Dr. Crane did not testify that Guzon should have come to the hospital earlier to examine wife; instead, he stated that Guzon could have "gotten more information and gotten treatment started over the phone or [had] somebody else see the patient." Moreover, Dr. Crane did not testify that Guzon failed to timely obtain a surgical consultation; instead, he stated that Guzon's decision regarding whether to obtain such a consultation "[d]epends on the ... doctor's own expertise" and that "there's no strict standard of care on that." While still on direct, he stated that wife had at least an

eighty percent chance of surviving "had she been treated properly." When asked by plaintiffs' counsel whether wife "would have fallen in ... the eighty per cent or the twenty per cent" group, Dr. Crane answered, "I think she would ... more likely than not have survived with a (sic) eighty per cent possibility."

Dr. Jacoby on direct also testified that Guzon violated the standard of care. He testified that Guzon failed to timely examine wife, to timely diagnose her illness by "order[ing] the appropriate tests to get to the bottom of what's going on," to timely start antibiotics, and to consult a surgeon. Dr. Jacoby, unlike Drs. Coleman and Crane, did not offer on direct a statistic concerning wife's probability of dying or surviving; however, when asked by plaintiffs' counsel whether wife had "an absence of bad factors that put her in a good survival category," Dr. Jacoby responded, "She at her presentation did not have some of the bad factors that would have predisposed her to doing poorly." When asked by plaintiffs' counsel,

> Do you have an opinion within a reasonable degree of medical certainty whether the deviations from the standard of care, the violations of the standard of care by Dr. Guzon, the negligence that we've talked about more probably than not would in your opinion or did those violations in your opinion cause Mrs. Bakers (sic) death?

Dr. Jacoby responded, "Insofar as not managing the patient and coming in, I think that allowed the patient to progress to the point where there really wasn't a chance to save her. So the answer would be yes." However, on cross-examination, when defense counsel asked Dr. Jacoby whether wife "still would have had a twenty-five per cent chance of dying," even if his recommended treatment regimen had been followed, he answered, "Yes."

At the close of Bakers' evidence, Guzon filed a motion for directed verdict. He contended that Bakers had not satisfied their burden of proof because their experts' testimony failed to establish that, "but for" Guzon's alleged negligence, wife would not have died, as is required by the wrongful death

statute and by Missouri law. Furthermore, Guzon contended that, regardless of the course of treatment, wife had between a twenty and thirty percent chance of dying. Moreover, he argued that Bakers had pleaded and submitted to the jury a claim for wrongful death rather than a claim for lost chance of recovery as set forth in *Wollen v. DePaul Health Center*, 828 S.W.2d 681 (Mo. banc 1992), and that Bakers had failed to make a submissible case of wrongful death with respect to causation. The trial court denied his motion.

Guzon presented evidence that included his own testimony and the expert testimony of medical doctors Aquino and Kennedy. Guzon testified that, after speaking to Dr. Rumley on the phone, he understood that wife "was a healthy female who presented to the emergency department with swelling of her right shoulder and arm, complaining of much pain ... probably secondary to a lung tumor or lipoma." He stated that Dr. Rumley reported wife's condition as stable, that Dr. Rumley did not indicate any concern about infection, and that she never informed him that he needed to see wife immediately.

Dr. Aquino testified that his analysis of wife's symptoms revealed that she was critically ill. From his review of wife's medical records he concluded that, "within a reasonable degree of medical certainty," wife would have had only a twenty percent chance of survival. He also stated that, from the time of her presentation at the emergency room, she would not have been in the survival group. Dr. Kennedy also reviewed wife's medical records and testified that, "within a reasonable degree of medical certainty," wife's expected mortality was eighty percent at the time she presented to the hospital. At the close of all the evidence, Guzon renewed his motion for directed verdict, which the court denied.

At the instruction conference, Guzon objected to the entire instruction package, including Instruction Number Seven and Instruction Number Eight, which provided in pertinent part:

### INSTRUCTION NUMBER 7

In your verdict you must assess a percentage of fault to [Guzon] if you believe:

\* \* \*

Second, [Guzon] either:

failed to timely diagnose [wife's] infection, or

failed to timely examine [wife], or

failed to timely order intravenous antibiotics, or

failed to timely obtain surgical consultation, and

Third, [Guzon] in any one or more of the respects submitted in paragraph second was thereby negligent, and

Fourth, such negligence directly caused or directly contributed to cause [wife's] death.

\* \* \*

### INSTRUCTION NO. 8

In your verdict, you must not assess a percentage of fault to [Guzon] unless you believe [he] was negligent as submitted in Instruction No. 7 and that such negligence directly caused or directly contributed to cause the death of [wife].

\* \* \*

In her objection to the instruction package, defense counsel stated:

It is error to submit this case on the theory of wrongful death as pleaded in this case since I do not believe that [Bakers] ha[ve] met their burden of proof, that but for the neigligence (sic) of Dr. Guzon, Ms. Baker would have died and was a direct result of such negligence. I believe they have substantiated a loss of chance cause of action with the testimony offered by their experts, Dr. Coleman at thirty percent, Dr. Crane at twenty per cent and Dr. Jacoby at twenty-five per cent but the case has not been pleaded for a loss (sic) chance, it is pleaded as a wrongful death and it's submitted as such, so I'll stand by my position generally regarding this entire package.

The trial court overruled the objection and submitted the instructions to the jury. The jury returned a verdict in favor of Bakers for $829,500, of which $75,600 constituted past economic damages including past medical damages, $226,800 constituted past non-economic damages, $300,300 constituted future economic damages, and $226,800 constituted future non-economic damages.

After the jury returned its verdict, Curtis Baker, Darin Baker, and Lisa Clow filed affidavits in which they stated that they were in agreement with the separate settlement with St. Anthony's Medical Center and having the proceeds of their wrongful death action, net of attorney's fees and expenses, divided as follows: seventy percent to husband, ten percent to Curtis Baker, ten percent to Lisa Clow, and ten percent to Darin Baker. Additionally, Bakers, including husband, filed a petition for approval of the wrongful death settlement with St. Anthony's Medical Center and stated that they had entered a contract of employment with plaintiffs' counsel for a contingency attorney fee in the amount of forty percent of any amount recovered plus expenses.

Guzon filed a motion to amend judgment and for evidentiary hearing concerning periodic payments. In his motion, pursuant to section 538.220.2, he made a request for periodic payments with respect to the total future damages of $527,100. He also requested that the trial court credit $340,000 paid in settlement by St. Anthony's Medical Center against the verdict. Additionally, noting that he and Bakers had not agreed to the terms of the periodic payment schedule, the interest rate or its compounding, or any other items required for an order for periodic payment, Guzon requested an evidentiary hearing concerning same. Bakers filed a response in opposition to Guzon's motion to amend judgment. They argued that Guzon's request for a credit should be denied because, they contended, section 538.230 "does not allow for a credit for pre-trial settlements." Additionally, they opposed Guzon's request for an evidentiary hearing concerning periodic payments, which payments they argued would be "unnecessary to accomplish the specific purpose" of section 538.220.2.

Noting that Guzon had only $200,000 in liability insurance, they argued that ordering the periodic payment of future damages would "create an injustice in [Bakers'] attempts to collect the excess verdict."

Guzon also filed a motion for judgment notwithstanding the verdict or, in the alternative, for new trial, contending that Bakers' evidence failed to establish that his actions resulted in wife's death but rather, at best, only established that, "but for" his actions, wife had a material chance of survival or recovery which she lost. Furthermore, pursuant to *Wollen,* he contended that Bakers' evidence did not establish a claim under the wrongful death statute but, at best, established a claim for lost chance of survival or recovery.

The trial court scheduled a hearing at which Guzon and Bakers offered oral arguments in support of and in opposition to both the motion for judgment notwithstanding the verdict or, in the alternative, for new trial, and the motion to amend judgment. The trial court then denied Guzon's motion for judgment notwithstanding the verdict or, in the alternative, for new trial, "in all respects." Pursuant to section 538.230.3, the trial court also denied Guzon's motion to amend judgment as to any credit. However, the trial court granted Guzon's request for periodic payments. Noting that, at the hearing on the post-trial motions, the trial court was advised that the parties had not agreed on the issue of periodic payments, the trial court "accordingly resolved such issues pursuant to [section] 538.220.2" by ruling that each item of damages assessed by the jury be reduced on a pro rata basis by the attorney's fees and costs, and that only the amount of future damages payable to husband be subject to periodic payments because only that amount exceeded the statutory amount of $100,000. Furthermore, the trial court ordered that the future damages payable to husband be paid in two equal installments: one due and payable immediately and one due and payable in three years, with interest at nine percent per annum.

In his first point on appeal, Guzon contends that the trial court erred in overruling his motions for directed verdict and for judg-ment notwithstanding the verdict because Bakers had failed to make a submissible case of wrongful death as to causation.

█ To make a submissible case of wrongful death, Bakers must present substantial evidence supporting every element of their claim. *Spring v. Kansas City Area Transp. Auth.,* 873 S.W.2d 224, 225 (Mo. banc 1994). In deciding whether Bakers made a submissible case, we must view the evidence in the light most favorable to them, giving them the benefit of all reasonable inferences. *Id.; Lester v. Sayles,* 850 S.W.2d 858, 871 (Mo. banc 1993). Furthermore, the jury is free to believe all, part, or none of the testimony presented, and is the sole arbiter of its weight. *DeLong v. Hilltop Lincoln–Mercury,* 812 S.W.2d 834, 842 (Mo.App. E.D. 1991).

In *Wollen,* our Supreme Court considered the sufficiency of the pleading of a wrongful death claim as to causation. Mrs. Wollen, the spouse of decedent, alleged in her petition for wrongful death that if doctors had performed appropriate tests, or had correctly interpreted the tests that they had performed, they would have diagnosed her husband as having gastric cancer. Furthermore, she alleged that if they had timely diagnosed his illness and had given him appropriate treatment, he would have had a thirty percent chance of survival and cure. Each defendant filed a motion to dismiss the petition on the ground that Mrs. Wollen had failed to plead that a causal connection existed between defendants' negligence and Mr. Wollen's death. The trial court sustained defendants' motions. *Wollen,* 828 S.W.2d at 681–82.

In considering Mrs. Wollen's appeal, our Supreme Court observed that in "failure-to-diagnose" cases, the fact which must be pleaded to show causation often is statistical. The problem can be avoided if the plaintiff can plead that there is "reasonable medical or scientific certainty" that defendant's negligence caused the harm. Furthermore, the Court noted in such cases three possibilities: two of which involve "reasonable medical certainty" and a third that does not.

The first possibility is the circumstance that could be phrased as "but for" causation. In this circumstance, the patient has a disease for which, at the stage the patient seeks diagnosis, there is a cure that works in the overwhelming majority of cases. Death from this type of disease caught at this stage is rare unless either the patient or the doctor is negligent at some stage of the treatment.

The second possibility is exactly the opposite. In this circumstance, there is no known cure for the disease. Medical science can only, at best, extend the patient's life a short time. In the overwhelming majority of cases, the disease is fatal except for a small number of spontaneous remissions or cures.

The third possibility is the one that appears in [*Wollen*]. Doctors have a treatment that works in a large number of cases and fails in a large number of cases. Because there is a real chance that the patient will survive and a real chance that the patient will die from the disease—even if it is diagnosed—it is impossible for a medical expert to state with "reasonable medical certainty" the effect of the failure to diagnose on a specific patient, other than the fact that the failure to diagnose eliminated whatever chance the patient would have had.

*Id.* at 682.

The theory of proportional causation was rejected in *Wollen.* *Id.* at 685. The Court emphasized that the proper place for an inquiry concerning one's chance of recovery is in the damages stage of a successful claim specifically for lost chance of recovery and not in the liability or causation stage of any claim. *Id.* at 684. The Court noted,

By its very nature ... the statistical inference involved in a wrongful death action for failure to diagnose involves a speculative leap of faith. ... Regardless of the exact percent of individuals in the circumstances of the decedent, as long as there is a significant chance of either survival or death, the statistic cannot tell whether *the* decedent would have survived if properly diagnosed.

*Id.* at 685 (emphasis in original). Because a statistic merely establishes that a specific individual either could survive or could die and does not *per se* establish that he or she is in the survival group, presentation of such a statistic, without more, does not give a jury a basis to believe that the decedent belongs to either the group that lives or the group that dies. *Id.* at 686.

Applying this theory of causation to the facts pleaded in Mrs. Wollen's petition, the Court found that the petition's problem concerned not the facts but rather that Mrs. Wollen had filed her cause of action under the wrong statute. *Id.* at 685. Mrs. Wollen had filed her action under the wrongful death statute, section 537.080, which provides in pertinent part:

1. Whenever the death of a person results from any act, conduct, occurrence, transaction, or circumstance which, if death had not ensued, would have entitled such person to recover damages in respect thereof, the person or party who, or the corporation which, would have been liable if death had not ensued shall be liable in an action for damages, notwithstanding the death of the person injured ...

* * *

Assuming that Mrs. Wollen could prove by a preponderance of the evidence that a statistical chance of survival existed, as she had pleaded, the Court had to determine whether a jury could infer from her allegation of a thirty percent chance of survival that Mr. Wollen's death resulted from and was caused by the doctors' negligence. *Wollen,* 828 S.W.2d at 685.

To simplify the analysis of the question, the Court imagined three possible petitions. The first petition, like Mrs. Wollen's petition, contained an allegation of wrongful death and contended that the decedent would have had a thirty percent chance of survival if doctors had properly diagnosed the disease. The second petition also contained an allegation of wrongful death and contended that the decedent would have had a seventy percent chance of survival. The third petition involved a cause of action filed under the survivorship provisions, section 537.020. The

Court noted that the language of the survivorship statute and the language of the wrongful death statute are mutually antagonistic. The survivorship statute applies when the alleged injury did not cause death and the wrongful death statute applies when the injury did cause death. *Id.*

Recognizing that the first two imagined petitions offer no more than statistical allegations that do not give a jury a basis to believe that the decedent belongs to either the group that survives or the group that dies, and emphasizing that, regardless of whether the chance of survival is greater than or less than fifty percent, it is impossible to prove that the decedent's death resulted from and was caused by the failure to properly diagnose and treat, the Court declared that, as a matter of Missouri law, neither of the wrongful death actions pleaded in those two petitions are allowed under the wrongful death statute. *Id.* at 686. Only the third petition filed under the survivorship statute is allowed because such a petition, by definition, does not allege that an injury caused death.

Here, Guzon contends that *Wollen* controls and that the judgment should be reversed because Bakers submitted their claim under the wrongful death statute and are relying upon no more than statistical evidence to establish a causal link between Guzon's actions and wife's death. He refers to the contention in the second imagined petition involving a seventy percent chance of survival and compares this contention to Bakers' experts' testimony that wife had between a seventy and eighty percent chance of survival.

Bakers contend that *Wollen* is distinguishable in that the *Wollen* Court described a petition that alleged no more than a statistical chance of recovery, whereas their experts offered more, including testimony establishing that, "more likely than not," wife would have been in the survival group because positive prognostic factors existed. Indeed, during their oral argument in opposition to Guzon's motion for new trial, Bakers noted that they "turn[ed] it around with Dr. Jacoby" by asking him whether Guzon's actions "more probably than not would in [his] opinion or did those violations in [his] opinion cause

Mrs. Bakers (sic) death" and receiving the response, "Insofar as not managing the patient and coming in, I think that allowed the patient to progress to the point where there really wasn't a chance to save her. So the answer would be yes."

Bakers direct our attention to *Schiles v. Schaefer*, 710 S.W.2d 254 (Mo.App. E.D. 1986), another wrongful death case. In *Schiles*, the wife, mother, and two minor children of the decedent claimed in their petition that Mr. Schiles had died as a result of defendants' failure to diagnose and treat his pulmonary embolization. On direct examination, Dr. O'Brian, one of plaintiffs' experts, testified that if proper treatment of Mr. Schiles by defendants had ensued, "he would not have sustained fatal pulmonary embolization." *Id.* at 259. Another of plaintiffs' experts on direct testified that "within a reasonable degree of medical probability ... the man would not have suffered a saddle embolus." *Id.* Thus, both doctors on direct offered unequivocal expert opinions that established a causal link between defendants' actions and Mr. Schiles's death. *Id.* at 261.

On cross-examination, Dr. O'Brian acknowledged that a twenty-five percent incidence of embolization exists even when a patient receives the proper treatment. Defendants argued that such testimony rendered Dr. O'Brian's earlier testimony concerning the cause of Mr. Schiles's death merely speculative, thereby justifying the exclusion of his earlier testimony. *Id.* at 259. We rejected this argument and held that

> [t]he percentages referred to did not vitiate his expert opinion. The testimony in this case went beyond percentages, and included unequivocal expert opinions.... Furthermore, Dr. O'Brian's testimony was not speculative. It was not couched in terms of possibilities; it was instead expressed clearly in terms of *reasonable* medical certainty. The fact that statistics were cited indicates that Dr. O'Brian *did* have a scientific basis for his opinion, and his admission that decedent might have died with heparin therapy establishes

merely that his opinion was based on *reasonable, not absolute medical certainty.* *Id.* at 261 (emphasis in original).

■ In light of our Supreme Court's holding in *Callahan v. Cardinal Glennon Hospital,* 863 S.W.2d 852 (Mo. banc 1993), another medical malpractice case, any doubts about the *Wollen* Court's rejection of proportional causation or its requirement of "but for" causation no longer remain. In *Callahan,* the Court stated that "the 'but for' test for causation is applicable in all cases except those involving two independent torts, either of which is sufficient in and of itself to cause the injury, i.e., the 'two fires' cases." *Callahan,* 863 S.W.2d at 862–63. Thus, in wrongful death actions, plaintiffs must establish that, "but for" the actions or inaction of the defendant, the decedent would not have died. This requirement exists because the term *but for* refers to an absolute minimum for causation; it is merely causation in fact. *Id.* at 862. Any attempt to find liability absent actual causation is an attempt to connect the defendant to an injury or event with which the defendant had nothing to do. *Id.*

■ Here, Dr. Coleman and Dr. Crane did not offer opinions stating that, within a reasonable degree of medical certainty, the actions or the inaction of Guzon caused the death of wife. Their responses, although medically informative regarding the disease and the actions that could have been taken to help wife, were equivocal as to causation. On direct, Drs. Coleman and Crane offered statistics regarding wife's chances of surviving (seventy percent and eighty percent, respectively) and chances of dying (thirty percent and twenty percent, respectively) and testified that, "more likely than not," wife would have been in the survival group. In contrast, Dr. O'Brian in *Schiles* had testified that the decedent "would not have sustained fatal pulmonary embolization" if he had received proper treatment. *Schiles,* 710 S.W.2d at 259.

Although the causation evidence offered by Drs. Coleman and Crane tracks the second imagined petition of *Wollen,* the testimony of Dr. Jacoby is different. *Wollen,* 828 S.W.2d at 685. Unlike Drs. Coleman and Crane, Dr. Jacoby did not offer on direct a statistic concerning wife's probability of dying:

Q. (Plaintiffs' Counsel:) Okay. Doctor, had Dr. Guzon complied with the standard of care and not violated it, do you have an opinion as to whether his failure to come in and manage this patient when he should have come in and managed it—managed her, whether that caused her death?

Defense Counsel: Object to the form, it's an improper standard.

* * *

Q. (Plaintiffs' Counsel:) Doctor, let me ask the question again . . .

A. Okay.

Q. Do you have an opinion within a reasonable degree of medical certainty whether the deviations from the standard of care, the violations of the standard of care by Dr. Guzon, the negligence that we've talked about more probably than not would in your opinion or did those violations in your opinion cause Mrs. Bakers (sic) death?

A. Insofar as not managing the patient and coming in, I think that allowed the patient to progress to the point where there really wasn't a chance to save her. So the answer would be yes.

Q. Doctor we've heard a lot of discussion about when it was too late, when was her last chance and we talked about prognostic factors and I want to kind of put those two together when I ask you these questions. Did this patient have factors when she came into the emergency room and let me put it another way, did she have an absence of bad factors that put her in a good survival category, which is a basis for your opinion that she would have survived here?

A. She at her presentation did not have some of the bad factors that would have predisposed her to doing poorly.

* * *

Relying on Dr. Jacoby's direct testimony, Bakers contend that they fulfilled the *Wollen* Court's admonition that plaintiff "plead that there is ·a reasonable medical or scientific certainty that [Guzon's] negligence caused

the harm." *Wollen*, 828 S.W.2d at 682. Specifically, they note that Dr. Jacoby stated within a reasonable degree of medical certainty that Guzon's actions or inaction "more probably than not would ... or did ... cause [wife's] death." We agree.

Our decision in *Tompkins v. Cervantes*, 917 S.W.2d 186 (Mo.App. E.D.1996), is informative. There, Ormayne and Mary Lou Tompkins (collectively parents), the parents of thirteen year old Steven Tompkins (son), alleged in their petition for legal malpractice that if their attorney had elicited testimony from Dr. Resnik, a medical expert whom their attorney had retained for trial, Dr. Resnik could have given testimony that would have satisfied the causation requirement in their underlying medical malpractice action for wrongful death. Parents further alleged that their attorney negligently had failed to elicit such testimony from Dr. Resnik, thereby "dooming" parents' case. In defense of parents' action against him, their attorney filed a motion for summary judgment, which the trial court sustained. *Tompkins*, 917 S.W.2d at 187–88.

Before considering parents' appeal, we briefly reviewed the facts and procedural posture concerning the underlying medical malpractice action for wrongful death that parents had filed against Dr. Kusama, a physician who had treated son for various psychological afflictions during the weeks prior to son's death. On May 11, 1981, son announced a premonition of his being involved in a high-speed chase with police, which chase ended with his crashing into a concrete post, killing himself and others. Hearing this frightful forecast from son apparently prompted parents to seek treatment for him. Dr. Kusama, son's treating physician, diagnosed son as suffering from an ongoing intermittent suicidal condition and an anxiety disorder and prescribed medication to control these illnesses. Approximately four days after son had announced his premonition, Dr. Kusama apparently withdrew as son's treating physician and ceased to monitor son's status, failing to inform parents or any other member of hospital staff of his withdrawal. *Id.*

Approximately fifteen days later, son took the family Oldsmobile without permission and stopped at a public park with some friends. When a pair of police officers "happened upon" son and his friends, one of son's friends who already had a brief exchange with the officers told son that the officers were looking for him and implored son to flee immediately. Son and his friends fled but the officers pursued. In the ensuing chase, the Oldsmobile struck a concrete post, killing son and five of his passengers. *Id.* at 187.

In parents' wrongful death action against Dr. Kusama, their attorney's theory was that Dr. Kusama's failure to monitor son's compliance with his medication schedule and Dr. Kusama's failure to inform parents and other doctors of his withdrawal from son's care left son with an untreated suicidal condition. Their attorney further theorized that the fatal crash was an act of suicide committed by son, which act would not have occurred if not for Dr. Kusama's negligence. However, Dr. Resnik, the medical expert whom their attorney had retained for trial, could not testify in his deposition that son's death was a suicide. The jury returned a verdict in favor of parents and awarded them $562,000, but on appeal this court overturned the jury verdict, *ruling that, as a matter of law, insufficient evidence of causation existed because there was no substantial evidence that son's death was a suicide. Id.* at 188 (citing *Tompkins v. Kusama*, 822 S.W.2d 463 (Mo.App. E.D. 1991)).

After reviewing the facts and procedural posture concerning parents' medical malpractice action for wrongful death against their son's physician, we considered the facts directly related to parents' legal malpractice action against their attorney. In their petition for legal malpractice, parents alleged that, although Dr. Resnik's testimony could not establish that son's death was a suicide, Dr. Resnik nevertheless could have given testimony that would have satisfied the causation requirement in their underlying medical malpractice action for wrongful death. Parents further alleged that their attorney negligently had failed to elicit such testimony from Dr. Resnik, thereby "dooming" parents' case. *Id.*

Parents presented the deposition testimony of Dr. Resnik to support their allegations. On pages 35–36 and again at page 124 of his deposition transcript, Dr. Resnik stated that "it is more likely than not that [son] would not have died if Dr. Kusama had not been negligent." On page 125, Dr. Resnik conceded that he could not state with reasonable medical certainty that Dr. Kusama's negligence caused son's death. However, at page 128 and again at pages 130–31, he did state with reasonable medical certainty that Dr. Kusama's negligence "caused" son's fleeing from the police. On the next page, he stated that Dr. Kusama's negligence "more likely than not caused" son's flight from the police. On page 123, Dr. Resnik admitted that, after being presented with a proposed affidavit stating that son's death "would have been prevented" if not for Dr. Kusama's negligence, he changed the sentence to read "might have been prevented." Additionally, at page 134, Dr. Resnik explained that the phrase "might have" means "more likely than not" to him; elsewhere in the deposition, he glossed "reasonable medical certainty" to mean "more likely than not." Therefore, all three phrases apparently were identical to him. Finally, on the next page, Dr. Resnik admitted that he could not state with reasonable medical certainty that proper treatment "would have saved" son's life; instead, he could state only that "it is more likely than not" that such treatment would have done so. Thus, he tacitly conceded that he did not regard these standards as identical. *Id.* at 189–90.

On appeal, parents contended that their attorney could have established a causal connection between son's death and Dr. Kusama's negligence by presenting Dr. Resnik's expert testimony that son would not have fled from the police but for Dr. Kusama's negligence. In considering their appeal, we noted that the dispositive issue concerned whether the evidence which parents presented in their legal malpractice action would have been sufficient to satisfy the causation element of the medical malpractice tort; if such evidence would have been sufficient, then parents had pleaded a submissible case of legal negligence. *Id.* at 189.

In considering their appeal, we observed, "To establish causation, the tortfeasor's conduct must be both the cause in fact and the proximate, or legal, cause of the plaintiff's injury." *Id.* at 190 (citing *Callahan* generally). We noted that the familiar "but for" test applies for the purpose of establishing cause in fact, except in those rare cases in which two independent forces concur to cause an injury. *Id.* (citing *Callahan*, 863 S.W.2d at 860–61). Referring to the second part of the causation element, proximate cause, we observed,

> If a prior and remote cause does nothing more than give rise to an occasion by which an injury is made possible, and there intervenes between that cause and the injury a distinct and unrelated cause of injury, a negligence action does not lie, even though the "but for" test is satisfied.

*Id.* at 191. We added,

> When a party relies on expert testimony to provide evidence as to causation when there are two or more possible causes, that testimony must be given to a reasonable degree of certainty. *Wyckoff v. Davis,* 297 S.W.2d 490, 494 (Mo.1957). When an expert merely testifies that a given action or failure to act "might" or "could have" yielded a given result, though other causes are possible, such testimony is devoid of evidentiary value. *Bertram v. Wunning,* 385 S.W.2d 803, 807 (Mo.App. E.D.1965).

*Tompkins,* 917 S.W.2d at 189 (other citations omitted). Finally, we noted, "Where the only evidence of a necessary element of a claim is self-contradictory, it does not constitute sufficient evidence." *Id.* at 190 (citing *Yoos v. Jewish Hospital,* 645 S.W.2d 177, 185–87 (Mo.App. E.D.1982)).

Applying these principles of causation to the deposition testimony offered by Dr. Resnik, we noted that his testimony established that Dr. Kusama's negligence either "more likely than not caused" son's flight from police or "caused" son's flight. However, noting our de novo standard of review for summary judgment, we concluded that Dr. Resnik's testimony sufficiently linked son's flight from the police to Dr. Kusama's negligence. *Id.*

Nevertheless, we did not find this linkage sufficient to satisfy the causation requirement as to son's death. *Id.* Dr. Resnik's testimony established that if Dr. Kusama had not acted negligently, then son "would not have" fled from the police. However, parents did not seek to recover for son's flight from the police, an occurrence for which parents could have held Dr. Kusama liable. *Id.* at 191. Instead, parents sought to recover for son's death. Dr. Resnik had testified that if Dr. Kusama had not acted negligently, son "more likely than not . . . would not have died." We determined that such testimony did not establish a link between Dr. Kusama's negligence and son's death. Thus, we rejected parents' argument that their attorney could have established Dr. Kusama's liability simply by adducing evidence that son would not have fled from police but for Dr. Kusama's negligent treatment. *Id.* at 190–91. Finding that their attorney could not have established Dr. Kusama's negligence as the cause of son's death under any theory, we affirmed the trial court's granting of summary judgment. *Id.* at 188.

Here, Dr. Jacoby's testimony established that Guzon's actions or inaction either "more probably than not" would cause wife's death or "did" cause wife's death. This disjunctive testimony, taken in the context of Dr. Jacoby's direct testimony, was not contradictory. The use of the words "more probably than not" and "did" within the same sentence did not render Dr. Jacoby's testimony insufficient for the purpose of establishing a causal link between wife's death and Guzon's negligence. On the contrary, his testimony successfully established such a link. Thus, Dr. Jacoby's direct testimony met the "but for" test and established that Guzon's negligence caused wife's death. Furthermore, on cross-examination, Dr. Jacoby did not vitiate his opinion by responding affirmatively to a statistic, namely, wife's "twenty-five per cent chance of dying." As in *Schiles,* the fact that Dr. Jacoby acknowledged that statistic indicated that there was a scientific basis for his opinion and that his opinion was based on reasonable, not absolute medical certainty. *Schiles,* 710 S.W.2d at 261. Thus, his testimony constitutes substantive causal evidence

linking wife's death to Guzon's negligence. Point denied.

In his second point on appeal, Guzon contends that the trial court erred in permitting Bakers to submit the case to the jury under Instruction Number Seven, the verdict director, because each disjunctive submission contained in the instruction was not supported by substantial evidence that but for (a) Guzon's alleged failure to timely diagnose wife's infection, she would not have died; (b) Guzon's alleged failure to timely examine wife, she would not have died; (c) Guzon's alleged failure to timely order intravenous antibiotics, she would not have died; and (d) Guzon's alleged failure to timely obtain surgical consultation, she would not have died. Essentially, Guzon argues that Bakers did not establish a causal link between wife's death and any of the four disjunctive submissions contained in paragraph second of the verdict director.

■ On direct examination, Dr. Coleman testified that Guzon violated the standard of care by failing to timely examine wife, diagnose her infection, order intravenous antibiotics, and obtain a surgical consultation. This testimony established Guzon's negligence as to the four disjunctive submissions. However, Dr. Coleman testified as to causation that if Guzon had complied with the standard of care, wife "more likely than not" would have been in the survival group. As in *Tompkins,* such testimony did not establish a link between Guzon's negligence and wife's death. *Tompkins,* 917 S.W.2d at 190–91.

Also on direct, Dr. Crane offered testimony that Guzon violated the standard of care by failing to timely diagnose wife's illness and order intravenous antibiotics. This testimony established Guzon's negligence as to two of the four disjunctive submissions. As to causation, Dr. Crane testified that, "had she been treated properly," wife "more likely than not [would] have survived with a(sic) eighty per cent possibility." Again, as in *Tompkins,* such testimony did not establish a link between Guzon's negligence and wife's death.

Dr. Jacoby testified that Guzon failed to timely examine wife, to timely diagnose her illness by "order[ing] the appropriate tests to

get to the bottom of what's going on," to timely start antibiotics, and to consult a surgeon. His testimony established Guzon's negligence as to the four disjunctive submissions. Later on direct, Dr. Jacoby testified that Guzon's negligence "more probably than not would ... or did" cause wife's death. As we noted in our disposition of point one, such testimony established a causal connection between Guzon's negligence and wife's death. Thus, each disjunctive submission of Instruction Number Seven was supported by substantial evidence. Point denied.

■ In his third point on appeal, Guzon contends that the trial court erred in finding that, under section 538.220.2, only that portion of the future damages award of $527,100 exceeding $100,000 and payable to an individual plaintiff was subject to periodic payments and in entering a periodic payment order that first deducted attorney's fees and expenses from the future damages award and then ordered only two periodic payments to husband.

Section 538.220 provides in pertinent part: 2. At the request of any party to such action made prior to the entry of judgment, the court shall include in the judgment a requirement that future damages be paid in whole or in part in periodic or installment payments if the total award of damages in the action exceeds one hundred thousand dollars. Any judgment ordering such periodic or installment payments shall specify the recipient, the amount of each payment, the interval between payments, and the number of payments. The parties shall be afforded the opportunity to agree on the manner of payment of future damages, including the rate of interest, if any, to be applied, subject to court approval. However, in the event the parties cannot agree, the unresolved issues shall be submitted to the court for resolution, either with or without a post-trial evidentiary hearing which may be called at the request of any party or the court....

\* \* \*

We note that, under this section, the trial court shall order that future damages be paid in whole or in part in periodic payments. Furthermore, under the same section, the trial court shall specify the recipient, the amount of each payment, the interval between payments, and the number of payments. Thus, the trial court did not err in ordering that only husband receive the two periodic payments.

■ Guzon's argument concerning the deduction of attorney's fees ignores the provisions of section 538.220.4, which provides in pertinent part: "If a plaintiff and his attorney have agreed that attorney's fees shall be paid from the award, as part of a contingent fee arrangement, it shall be presumed that the fee will be paid at the time the judgment becomes final." We find that the trial court did not err in entering an order that first deducted attorney's fees from the future damages award before ordering periodic payments. *See Roesch v. Ryan,* 841 F.Supp. 288 (E.D.Mo.1993).

■ In arguing that the trial court erred in entering an order that first deducted expenses from the future damages award before ordering periodic payments, Guzon notes that no provision in section 538.220 authorizes such a deduction. Although the section is silent as to expenses, Bakers and their attorneys have agreed to deduct the litigation expenses, which, like attorney's fees and past damages, would not be incurred in the future. Such an agreement is in accord with the section's intent. Therefore, the trial court acted properly in ordering expenses to be deducted from the future damages award. Point denied.

Judgment affirmed.

RHODES RUSSELL, P.J., and KAROHL, J., concur.