# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-2654

_____

Breayonna Aaron, individually and on behalf of Richie Terrell Aaron, Jr., deceased and on behalf of her minor children M.A., R.A. and L.A.; M.A., by and through next friend, Breayonna Aaron; R.A., by and through next friend Breayonna Aaron; L.A., by and through next friend Breayonna Aaron

*Plaintiffs - Appellees*

v.

National Railroad Passenger Corporation, doing business as Amtrak

*Defendant - Appellant*

Marquise L. Webb

*Defendant*

_____

No. 24-2693

_____

Breayonna Aaron, individually and on behalf of Richie Terrell Aaron, Jr., deceased and on behalf of her minor children M.A., R.A. and L.A.; M.A., by and through next friend, Breayonna Aaron; R.A., by and through next friend Breayonna Aaron; L.A., by and through next friend Breayonna Aaron

*Plaintiffs - Appellants*

v.

National Railroad Passenger Corporation, doing business as Amtrak

*Defendant - Appellee*

Marquise L. Webb

*Defendant*

————————

Appeals from United States District Court
for the Western District of Missouri

————————

Submitted: September 17, 2025
Filed: December 31, 2025

————————

Before BENTON, GRASZ, and KOBES, Circuit Judges.

————————

GRASZ, Circuit Judge.

National Railroad Passenger Corporation, doing business as Amtrak, appeals the district court's denial of its motion for judgment as a matter of law or, in the alternative, a new trial or a reduction in punitive damages in this suit for negligence and wrongful death. We reverse.

## I. Background

On January 14, 2022, Marquise Webb and Richie Aaron, Jr. separately boarded an Amtrak train in Normal, Illinois. The train was operating as part of Amtrak's Lincoln Service, which runs between Chicago, Illinois, and St. Louis, Missouri. Webb and Aaron did not know each other and were not traveling together.

Amtrak does not routinely conduct passenger security screening for weapons prior to boarding its trains, but it prohibits passengers from carrying firearms onboard. Amtrak enforces its firearm prohibition through language on its tickets and signage in its terminals. Notwithstanding the prohibition, and unbeknownst to Amtrak personnel, Webb boarded the train with a concealed firearm.

The Lincoln Service train arrived in St. Louis, and both Webb and Aaron changed trains to Amtrak's River Runner, which operates between St. Louis and Kansas City, Missouri. At 9:02 p.m., the River Runner made a scheduled stop at Lee's Summit, Missouri. At approximately 9:03 p.m., Webb suddenly shot Aaron in the back five times. There was no apparent motive for the random execution. After shooting Aaron, Webb exited the train.[1]

Several passengers heard loud noise from the gunshots. Some thought the noise was from fireworks, but others suspected it was gunfire. At least one passenger informed a member of Amtrak's crew about possible gun shots, but this crewmember apparently dismissed the noise as fireworks. The train departed from Lee's Summit at 9:08 p.m.

At some point before 9:19 p.m., Amtrak personnel discovered Aaron had been shot. A conductor performed CPR on Aaron until the train arrived at the next station, Independence, at 9:23 p.m. Emergency medical services were present when the train arrived, but Aaron did not display signs of life upon arrival and was pronounced dead at 9:33 p.m.

In March 2022, Aaron's widow, Breayonna Aaron, on behalf of herself, Aaron, and their three minor children (collectively, the Aarons), sued Amtrak asserting three causes of action under Missouri law: (1) negligence and vicarious liability; (2) negligent hiring, training, and/or supervision; and (3) wrongful death.[2] The Aarons

---

[1]Webb was later apprehended by law enforcement. He pled guilty to voluntary manslaughter and other related charges and was sentenced to a term of imprisonment.

[2]The Aarons also asserted a claim for "negligence/assault and battery" against Webb. The district court entered default judgment against Webb, who failed to appear or otherwise defend himself in the case.

-3-

sought damages "in excess of $100 million," but did not explicitly request punitive damages.

In January 2024, the district court conducted a jury trial. After the close of the Aarons' case, Amtrak moved for judgment as a matter of law. The district court did not rule on Amtrak's motion and submitted the case to the jury. The district court also instructed the jury on punitive damages over Amtrak's objection and its motion to strike the Aarons' punitive damages claim due to their failure to plead punitive damages. The jury found Amtrak liable by general verdict and awarded the Aarons $8.8 million in compensatory damages and $150 million in punitive damages.

After the verdict, Amtrak renewed its motion for judgment as a matter of law and moved, in the alternative, for a new trial or a reduction in punitive damages. The district court denied Amtrak's renewed motion for judgment as a matter of law and its motion for a new trial. The district court, however, found the jury's award of punitive damages to be grossly excessive and, therefore, unconstitutional under the Due Process Clause of the Fourteenth Amendment. It reduced the punitive damages award to $35.2 million. The district court then entered final judgment.

Amtrak timely appeals the district court's denial of its motion for judgment as a matter of law, or, in the alternative, a new trial. Amtrak also appeals the amount by which the district court reduced punitive damages. The Aarons cross-appeal the district court's decision to reduce the punitive damages award. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1349, and we have jurisdiction under 28 U.S.C. § 1291.

## II.  Analysis

We review de novo a district court's denial of a motion for judgment as a matter of law (JMOL). *Milhauser v. Minco Prods.*, 701 F.3d 268, 272 (8th Cir. 2012). A district court may grant JMOL "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue[.]"  Fed. R. Civ. P.

50(a)(1). On a motion for JMOL, we view the evidence and draw every reasonable inference therefrom in favor of the verdict. *Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 946 (8th Cir. 2017). We may not make credibility determinations or weigh the evidence. *Id.*

Further, we apply Missouri law to the Aarons' claims, all of which are asserted under state law. *See Walker v. Barrett*, 650 F.3d 1198, 1203 (8th Cir. 2011). In doing so, "we look to relevant state precedent, analogous decisions, considered dicta, and any other reliable data to determine how the Supreme Court of [Missouri] would construe [Missouri] law." *Salier v. Walmart, Inc.*, 76 F.4th 796, 801 (8th Cir. 2023) (quoting *Ashley Cnty. Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009)). "If the Missouri Supreme Court has not spoken on an issue, we may consider opinions from the Missouri Court of Appeals as 'particularly relevant' and must follow them when those opinions provide 'the best evidence of Missouri law.'" *Walker*, 650 F.3d at 1203 (quoting *Bockelman v. MCI Worldcom, Inc.*, 403 F.3d 528, 531 (8th Cir. 2005)).

To establish a negligence claim under Missouri law, a plaintiff must prove: (1) the existence of a duty; (2) a breach of that duty; (3) causation; and (4) injury. *Madden v. C & K Barbecue Carryout*, 758 S.W.2d 59, 61 (Mo. 1988). Failure to prove any one element defeats a finding of negligence. *See, e.g., Rhoden v. Mo. Delta Med. Ctr.*, 621 S.W.3d 469, 482 (Mo. 2021).

Here, the district court instructed the jury to find Amtrak negligent if it found Amtrak failed to do any of the following (1) "exercise ordinary care to protect [Aaron] from the danger by failing to make the premises reasonably safe from foreseeable criminal acts by third parties"; (2) "adequately warn [Aaron] of the condition of the train or security on the train, or . . . warn [Aaron] of the absence of adequate security measures"; (3) "promptly and adequately investigate the noises that took place as [Aaron] was being shot"; (4) "seek medical assistance on the train to render aid to [Aaron] following the shooting"; or (5) "timely discover the need for medical attention and render aid to [Aaron] following the shooting." For each of these five "negligence theories," the Aarons were also required to prove causation

and injury. The jury found Amtrak liable in a general verdict; thus, it is unclear which negligence theory the jury relied upon. Nevertheless, Amtrak is entitled to JMOL because the Aarons failed to present sufficient evidence to satisfy all the requisite elements of a negligence claim for any presented theory. More specifically, if the verdict was premised on the first or second theory, there was insufficient evidence to conclude Amtrak had a legal duty. If the verdict was premised on the third, fourth, or fifth theory, there was insufficient evidence to establish causation.

## A. Absence of a Legal Duty

First, Amtrak argues the district court erred in denying it JMOL because the evidence did not establish an unprovoked shooting was foreseeable and, thus, under Missouri law, it did not have a duty to protect Aaron from the unforeseeable criminal acts of unknown third parties. We agree with Amtrak. There is not legally sufficient evidence to conclude Amtrak owed, or breached, a duty to protect Aaron from the criminal acts of third parties. Similarly, because Amtrak does not owe a duty to protect business invitees from the unforeseeable criminal acts of third parties, it does not owe a duty to warn its business invitees of such danger.

"Whether a duty exists is purely a question of law." *Lopez v. Three Rivers Elec. Coop.*, 26 S.W.3d 151, 155 (Mo. 2000). "The touchstone for the creation of a duty is foreseeability." *Madden*, 758 S.W.2d at 62. Generally, there is no duty to protect against the criminal acts of third parties "because such activities are rarely foreseeable." *L.A.C. v. Ward Parkway Shopping Ctr. Co., L.P.*, 75 S.W.3d 247, 257 (Mo. 2002). However, the Missouri Supreme Court recognizes two exceptions to this general rule: (1) "when the defendant knows, or has reason to know, that a third party is harming or is about to harm an entrant"; or (2) "when the nature of the defendant's business or past experience provides a basis for the reasonable anticipation on defendant's part that the criminal activity of third persons might put entrants at risk." *Wieland v. Owner-Operator Servs.*, 540 S.W.3d 845, 848 (Mo. 2018) (quoting The Law of Premises Liability § 11.03[1], 11-6). In this case, only the second exception is relevant. Under the second exception, to establish a duty,

the "plaintiff must show evidence that would cause a reasonable person to anticipate danger and take precautionary actions to protect its business invitees against the criminal activities of unknown third parties." *L.A.C.*, 75 S.W.3d at 258. The "plaintiff 'need not show that the very injury resulting from defendant's negligence was foreseeable, but merely that a reasonable person could have foreseen that injuries of the type suffered would be likely to occur under the circumstances.'" *Id.* (quoting *Smith v. Archbishop of St. Louis*, 632 S.W.2d 516, 521 (Mo. Ct. App. 1982)). "Violent crimes are foreseeable if the premises have been the site of other prior violent crimes, including robbery, assault, burglary, stealing, arson, abduction, murder, sexual assault and rape." *Id.* (citing to *Madden*, 758 S.W.2d at 62 n.2).

There is insufficient evidence to reasonably conclude violent crime on the River Runner was foreseeable. First, the Aarons do not present evidence that Amtrak experienced prior violent crime on the relevant premises, which was the River Runner. No shootings occurred on the River Runner or on Amtrak property in Missouri. The jury was only presented evidence of one incident of prior violent crime on the River Runner. That is, in 2021, a River Runner passenger brandished a knife and threatened a conductor.[3] Aside from this dissimilar incident, the Aarons do not provide the court with any other evidence about violent crime occurring on the River Runner. As a result, even when viewing the evidence in the light most favorable to the verdict, there are not sufficiently "numerous, similar, and recent [violent] crimes" to put Amtrak on reasonable notice of the danger of unprovoked shootings on the River Runner. *Wood v. Centermark Props.*, 984 S.W.2d 517, 524–25 (Mo. Ct. App. 1998) (holding there was no duty where plaintiffs alleged "20 incidents of allegedly violent crimes" occurring within the five-year period, none of which were "sufficiently similar to the carjacking, abduction and murder of decedent"); *see also Faheen v. City Parking Corp.*, 734 S.W.2d 270, 274–75 (Mo. Ct. App. 1987) (holding there was no duty where prior instances of violent crime

---

[3]The incident occurred during the COVID pandemic after the conductor instructed the passenger he needed to wear a mask. The passenger did not physically harm the conductor or any other passengers.

were "significantly different" types of crime from the crime committed against the decedent). This case is distinguishable from those in which the Missouri Supreme Court has held such a duty existed because the violent crime is significantly less frequent and is dissimilar to the random shooting that occurred here. *See Madden*, 758 S.W.2d at 62–63 (holding a duty existed where the premises had previously experienced "six armed robberies, six strong arm robberies, one assault, and one purse snatching" in the preceding three years); *see also L.A.C.,* 75 S.W.3d at 258 (holding a duty existed where "seventy-five violent crimes" occurred on the premises in the three years preceding the attack, "sixty-two percent" of which involved female victims like the plaintiff).

To attempt to establish this crime was foreseeable, the Aarons seek to expand the relevant premises too far. The Aarons argue prior instances of violent crime in Amtrak's entire Central Division, which consists of twenty-two states, are relevant to whether crime on the River Runner was foreseeable. For example, the Aarons point to evidence Amtrak recorded seventy-six violent crimes in Illinois and Missouri from 2019 until 2021;[4] and Amtrak had previously experienced two shootings in Illinois. The Aarons' view of "premises," however, does not comport with Missouri law. While trains may change location frequently, crime in one location does not necessarily indicate crime in another. *See Liszewski v. Target Corp.*, 374 F.3d 597, 600 (8th Cir. 2004) (determining that when interpreting Missouri law, we "give less weight to temporally remote crimes and crimes that occurred off premises because common sense dictates that a reasonable person would give less consideration to such events"). We cannot rely on crime statistics in other locations simply because those locations are owned and operated by Amtrak. In the same vein, we cannot look to crime statistics in cities the River Runner merely passes through. *See Faheen*, 734 S.W.2d at 273 ("The fact that crimes in general have occurred in an area or that a business is located in a 'high crime' area is

---

[4]An exhibit shows Amtrak recorded thirty-five violent crimes in 2019, twenty violent crimes in 2020, and twenty-one violent crimes in 2021. These violent crimes primarily occurred in Illinois; only five occurred in Missouri.

insufficient to invoke the duty."); *see also Wood*, 984 S.W.2d at 524–525 ("[U]nder the violent crimes exception, the incident must occur on premises controlled by the defendant."). For off-premises crimes to be relevant, there must be a discernable link to the premises. *See, e.g., Virginia D. v. Madesco Inv. Corp.*, 648 S.W.2d 881, 888 (Mo. 1983) (finding incidents of crime in a hotel's garage were not "insufficient to provide warning" to the hotel because there was "ample evidence that persons on the fringe of the law, and some quite over the border, could enter, remain, and misbehave in the hotel without great difficulty"). The Aarons, however, fail to connect prior violent crime in the Central Division to crime on the River Runner, specifically.

Further, we reject the Aarons' argument, and the district court's conclusion, that Amtrak's existing security measures indicate violent crime on the River Runner was foreseeable. As we have previously observed, "Missouri law makes clear that the provision of a security program does not give rise to a general duty to protect [business invitees]." *Liszewski*, 374 F.3d at 601. Missouri law also "makes clear that it is improper to infer knowledge of risk, and therefore duty, based on the hiring of security guards." *Id.*; *accord Miller v. S. Cnty. Ctr., Inc.*, 857 S.W.2d 507, 512 (Mo. Ct. App. 1993) ("To infer a duty from the mere fact of hiring security guards is no more legitimate than inferring a duty from the fact that a defendant purchases insurance. Greater prudence than the law otherwise requires is not a proper basis for the imposition of a duty; it is conduct society seeks to encourage."). Phrased differently, Amtrak's acknowledgement that crime was possible does not prove that this particular crime was sufficiently foreseeable to impose a legal duty. *See Lopez*, 26 S.W.3d at 156 (quoting *Zuber v. Clarkson Const. Co.*, 251 S.W.2d 52, 55 (Mo. 1952) (defining foreseeability as "the presence of some probability or likelihood of harm sufficiently serious that ordinary persons would take precautions to avoid it. The existence of a mere probability is insufficient. . . [there must be] 'some probability of sufficient moment to induce the reasonable mind to take the precautions which would avoid it'").

Therefore, we conclude there was legally insufficient evidence to confer a duty on Amtrak to protect Aaron from the criminal acts of third parties. As a direct result, Amtrak also did not have a duty to warn its business invitees of such unforeseen danger. *See Wofford v. Kennedy's 2nd Street Co.*, 649 S.W.2d 912, 914 (Mo. Ct. App. 1983) (holding that "because there was no duty to prevent injuries [caused by third party criminal actors], there was no duty to warn [invitees] of possible dangers"). If the jury's verdict was premised on either theory of negligence, Amtrak is entitled to JMOL.

## B. Absence of Causation

With the first two theories of liability failing due to a lack of duty, we turn to the remaining three theories, which relate to Amtrak's purported negligence in failing to discover the shooting and successfully render aid to Aaron. Amtrak argues the district court erred in denying it JMOL because there was no evidence its alleged failure to promptly discover Aaron and render medical care caused Aaron's death. In essence, Amtrak contends Aaron would have died from the gunshot wounds regardless of its employees' subsequent action and, thus, there is not but-for causation. We agree. The jury did not have a legally sufficient evidentiary basis to conclude Amtrak's alleged negligence was the but-for cause of Aaron's death.

In all negligence cases, Missouri courts require the plaintiff to prove causation. *Tharp v. St. Luke's Surgicenter-Lee's Summit, LLC*, 587 S.W.3d 647, 657 (Mo. 2019). "Proof of causation entails proof of causation in fact, or 'but-for' causation, as well as proximate causation." *Nail v. Husch Blackwell Sanders, LLP*, 436 S.W.3d 556, 562 (Mo. 2014). For present purposes, we are focused on but-for causation. But-for causation is causation in fact; it requires the plaintiff to prove their injury would not have occurred but for the defendant's conduct. *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860–61 (Mo. 1993). Specifically, in a wrongful death action, the plaintiff must prove the decedent would not have died but for the defendant's negligence. *Sanders v. Ahmed*, 364 S.W.3d 195, 209 (Mo. 2012). In a wrongful death action, but-for causation is "established through expert

testimony that there is a reasonable degree of medical or scientific certainty that but for the tortfeasor's conduct," the decedent would not have died. *Rhoden,* 621 S.W.3d at 482 (cleaned up) (quoting *Lowe v. Mercy Clinic E. Cmtys.*, 592 S.W.3d 10, 18 (Mo. Ct. App. 2019)). But-for causation is not established, however, if an expert testifies that a defendant's negligence "'might'" or "'could have'" caused the decedent's death, "though other causes are possible[.]" *Baker v. Guzon*, 950 S.W.2d 635, 647 (Mo. Ct. App. 1997) (stating "such testimony is devoid of evidentiary value").

Here, the Aarons did not present sufficient evidence to establish but-for causation to support their theories of wrongful death premised on Amtrak's inaction after the shooting occurred. The jury heard expert testimony from Dr. Brokish, an emergency room physician, about Aaron's chance of survival. Dr. Brokish testified if Amtrak took immediate action, by calling for emergency assistance at Lee's Summit or summoning onboard care, Aaron's survival rate "would be anywhere between 4 and 14 percent." In other words, Dr. Brokish stated that if Amtrak had acted promptly, Aaron's survival was still statistically unlikely. This evidence, without more, does not provide the jury with a sufficient basis to conclude Aaron would not have died but for Amtrak's negligence. Neither Dr. Brokish, nor any other expert, testified to a reasonable degree of medical certainty that Amtrak's inaction caused Aaron's death.[5] *See Sanders*, 364 S.W.3d at 209–210 (holding there was sufficient evidence to establish but-for causation where an expert "stated unequivocally" that a physician's substandard care "caused [the decedent] a very profound brain injury" that "led to her death"); *see also Baker*, 950 S.W.2d at 646–47 (finding but-for causation where an expert testified the defendant's action or inaction "more probably than not" and "did" directly contribute to the decedent's death). Instead, the evidence presented required the jury to make an impermissible

_____

[5]The Aarons claim Dr. Brokish testified that Aaron had an 80-90% survival rate. But, this claim is unsupported by the record. Dr. Brokish stated if Aaron was shot *in his waiting room*, Aaron's survivability rate would have been 80-90%. Dr. Brokish repeatedly testified Aaron's chance of survival was only 4-14%.

speculative inference that Aaron would have survived had Amtrak promptly summoned care. *See Wollen v. DePaul Health Ctr.*, 828 S.W.2d 681, 685 (Mo. 1992) (explaining that "there is a difference between logical inferences, and those inferences that involve a leap of faith that makes such inferences mere speculation").

The evidence does not support a reasonable inference that Amtrak's negligence "directly caused" or "directly contributed to cause" Aaron's death. At most, the evidence establishes Amtrak caused Aaron to lose a remote chance of survival. However, the Aarons brought a claim for wrongful death, not for lost chance of survival. *See Wollen*, 828 S.W.2d at 685 ("The language of the survivorship statute and the wrongful death statute are mutually antagonistic. The survivorship statute applies when the injury alleged did not cause death, and the wrongful death statute applies when the injury did cause death."). Therefore, under the Aarons' asserted cause of action, the jury did not have a legally sufficient evidentiary basis to reasonably conclude Amtrak's negligence was the but-for cause of Aaron's death. As such, if the jury's verdict was premised on Amtrak's alleged failure to promptly discover Aaron and render medical aid, Amtrak is entitled to JMOL.

## III.  Conclusion

For the reasons explained above, the Aarons do not satisfy at least one required element for each of their theories of negligence. Therefore, we hold the jury did not have a legally sufficient evidentiary basis to find Amtrak liable on any presented theory of negligence.[6] We reverse the district court's denial of Amtrak's motion for JMOL and direct the district court to enter judgment for Amtrak.

_____

_____

[6]Because we find that Amtrak is not liable on any of the Aarons' asserted claims, we do not address the parties' arguments about Amtrak's motion for a new trial or punitive damages.