

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| VINCENT LOWE, | ) | No. ED106447 |
| | ) | |
| Respondent /Cross-Appellant, | ) | Appeal from the Circuit Court of |
| | ) | of Franklin County |
| vs. | ) | 16AB-CC00047 |
| | ) | |
| MERCY CLINIC EAST COMMUNITIES, | ) | Honorable Stanley D. Williams |
| JAMES D. CASSAT, M.D., BRYAN J. | ) | |
| MENGES, D.O. and MERCY HOSPITALS | ) | |
| EAST COMMUNITIES, | ) | |
| | ) | |
| Appellants. | ) | Filed: October 1, 2019 |

## OPINION

I.  *Introduction*

Vincent Lowe brought this medical negligence suit in the Circuit Court of Franklin County

against Bryan J. Menges, D.O., and James D. Cassat, M.D., and their respective employers Mercy

Hospitals East Communities ("Mercy Hospitals") and Mercy Clinic East Communities ("Mercy

Clinic"), alleging that as a result of their negligent failure to timely diagnose and treat the condition

known as mesenteric ischemia which was causing inadequate blood supply to Lowe's intestines,

a substantial portion of his lower bowel had to be surgically removed leaving him with short bowel

syndrome[1] which requires extensive ongoing medical care.  The jury found in favor of Lowe

---

[1] Short bowel syndrome is caused by the loss of a significant portion of the small intestine resulting in nutrient malabsorption and difficulty in forming fecal matter.

returning a verdict for past and future economic and noneconomic damages totaling $14,245,545. The jury made comparative fault assessments of 65% to Dr. Menges and Mercy Hospitals, 25% to Dr. Cassat and Mercy Clinic, and 10% to Lowe for a net verdict of $12,820,990. After the trial court entered its judgment on the jury verdict in which the court ordered under § 538.220.2[2] the periodic payment of the future damages awarded by the jury, the parties filed cross-appeals. We affirm the judgment finding the doctors and their employers liable for Lowe's injuries but we reverse and remand the portion of the judgment pertaining to attorney's fees and to the periodic payment of future damages.

II.    *Factual Background*

The following facts are undisputed: At the time of the medical care at issue in this case, Lowe was 52 years old and had an extensive history of vascular disease requiring treatments that included coronary bypass surgery and the placement of cardiac and iliac stents. Around 11:00 p.m. on April 30, 2014, Lowe presented to the emergency department at Mercy Hospitals in Washington, Missouri, with severe abdominal pain. Dr. Menges, the emergency room physician, examined Lowe and took a medical history. Initially suspecting that Lowe's symptoms were the result of kidney stones, Dr. Menges ordered a non-contrast CT scan of Lowe's abdomen. The radiologist reported to Dr. Menges that there was abdominal gas, possibly of the type known as portal venous gas, around Lowe's liver. Because portal venous gas may be a sign of mesenteric ischemia—a dangerous condition involving the inadequate flow of blood to the intestines, which may lead to bowel death—the radiologist recommended an ultrasound to determine the character of the gas.

---

[2] All statutory references are to RSMo 2012 unless otherwise indicated.

2

Dr. Menges then telephoned Dr. Cassat, the emergency room's on-call surgeon, to confer about Lowe's condition. Dr. Cassat recommended an outpatient ultrasound. Dr. Menges agreed and discharged Lowe home in the early morning hours of May 1, 2014, with a diagnosis of a back strain and with directions to call to schedule an ultrasound on an outpatient basis. Three days later, Lowe became critically ill and returned to the emergency room. He had septic shock, was diagnosed with partial bowel death, and had to undergo several emergency surgeries to save his life which included the removal of seven feet—nearly half the length—of his bowel.

Lowe claimed Dr. Menges rendered negligent medical care (1) by failing to order an *inpatient* ultrasound while Lowe was under his care in the emergency room; (2) by failing to rule out mesenteric ischemia; and (3) by discharging Lowe under the circumstances. Lowe claimed Dr. Cassat, the on-call physician, also rendered negligent care (1) by failing to come to the hospital to assess Lowe in the emergency room; and (2) by failing to order an inpatient ultrasound prior to Lowe's discharge, among other tests.

After the jury returned the above verdict in Lowe's favor for past and future economic and non-economic damages, the court entered its judgment. With respect to the past economic and non-economic damages, the judgment awarded Lowe a lump sum of $2,470,990 to be paid immediately. With respect to the remaining $10,350,000 in future damages, the defendants invoked their right under § 538.220 to have the future damages paid out in whole or in part in periodic payments. So, the trial court made the following entries: First, the court ordered the $900,000 in future *noneconomic* damages to be paid in two annual installments of $450,000. Then, for the remaining $9,450,000 in future medical damages, the court established a 26-year periodic payment schedule that ordered annual payments which started with $988,134 to be paid in the first year, $778,638 paid in years two through five, $707,486 in years six through ten, and $113,117 in

3

years eleven through twenty-six. The court also made all future damages payments subject to the fixed interest rate of 1.48 percent derived from § 538.220.

Dr. Menges and Mercy Hospitals, and Dr. Cassat and Mercy Clinic, now appeal the trial court's judgment, and Lowe cross-appeals.[3] Drs. Menges and Cassat, their points considered together, (1) challenge the submissibility of Lowe's case against each of them; (2) assert instructional error; (3) contend the trial court should have granted a mistrial based on testimony of one of Lowe's medical experts; (4) complain that Lowe's life care plan and supporting testimony were erroneously admitted; and (5) cite the trial court's failure to adhere to § 538.220.2's mandatory formula for calculating the amounts of periodic future damages payments.

Lowe, for his part, claims that the trial court erred by failing to award him a lump sum sufficient to pay his attorney's fees because § 538.220.4 creates the presumption that, where the plaintiff has not made different arrangements with counsel, attorney's fees "will be paid at the time the judgment becomes final." Lowe also faults the trial court for ordering pursuant to § 538.220.2 future payments to be subject to the fixed interest rate of 1.48 percent.

We reverse the trial court's judgment solely as regards its damages award, on two grounds: (1) the court failed to adhere to § 538.220.2's mandatory formula for calculating the amounts of periodic future damages payments; and (2) the court violated § 538.220.4 by failing to award Lowe a lump sum sufficient to pay his attorney's fees. The case is remanded for entry of a new judgment in accordance with this opinion. In all other respects, the judgment is affirmed.

_____

[3] No further explicit reference will be made to Mercy Hospitals or Mercy Clinic as parties here. The liability of Mercy Hospitals and Mercy Clinic in this case is merely vicarious to that of their respective employees, Dr. Menges and Dr. Cassat, and we find no basis to distinguish between the actions or arguments of employer and employee here.

4

## Discussion

I.    *Lowe made a submissible case of negligence against both doctors.*

Each doctor challenges the submissibility of Lowe's case. Dr. Menges contends Lowe failed to present sufficient evidence of a causal connection between Dr. Menges's actions and Lowe's injuries, while Dr. Cassat, for his part, asserts he owed Lowe no duty because he did not have a physician-patient relationship with him. We disagree on both counts.

A.    The submissible case against Dr. Menges.

Viewing the record, as we must, in the light most favorable to Lowe, *Wicklund v. Handoyo*, 181 S.W.3d 143, 147 (Mo.App.E.D. 2005), we find that Lowe made a submissible case that Dr. Menges caused his injuries.[4]

Causation is established through expert testimony that there is a reasonable degree of medical or scientific certainty that but for the tortfeasor's conduct, the injured party would not have been damaged. *Id.* at 149. A court may reverse the jury's verdict for insufficient evidence only when there is a complete absence of probative fact to support the jury's conclusion. *Delacroix v. Doncasters, Inc.*, 407 S.W.3d 13, 26 (Mo.App.E.D. 2013) (en banc) (citing *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo.banc 2010)); *Sanders v. Ahmed*, 364 S.W.3d 195, 208

---

[4] The instructions in this case properly submitted the issue of Dr. Menges's liability on the grounds that he "directly caused or *directly contributed to cause* damage to plaintiff." (Emphasis added). This additional phrasing accounts for other causes of damage, including the plaintiff's comparative fault. *Carlson v. K-Mart Corp.*, 979 S.W.2d 145, 146 (Mo.banc 1998) ("The 'directly caused or directly contributed to cause' language is drawn from MAI 19.01, which allows the plaintiff to modify the verdict director in cases where there are multiple causes of damage."); *Snelling v. Gress*, 996 S.W.2d 538, 540 (Mo.App.W.D. 1999) (plaintiff's comparative fault case). We also note our Supreme Court has stated, "A causation analysis should not lose sight of the ultimate issue: . . . under MAI we do not use the terms 1) 'proximate cause,' 2) 'but for causation,' or 3) 'substantial factor' when instructing the jury. We merely instruct the jury that the defendant's conduct must 'directly cause' or 'directly contribute to cause' plaintiff's injury." *Sanders v. Ahmed*, 364 S.W.3d 195, 208 n.11 (Mo.banc 2012) (citing *Sundermeyer v. SSM Reg'l Health Servs.*, 271 S.W.3d 552, 555 (Mo.banc 2008)).

5

(Mo.banc 2012). Indeed, where reasonable minds may differ on the question before the jury, we cannot disturb the verdict. *Wicklund*, 181 S.W.3d at 147.

Here, Lowe presented ample evidence that Dr. Menges caused or contributed to cause his injuries. At least two experts including Dr. James Matthews, whose opinions Lowe adduced regarding Dr. Menges's care, testified that Lowe had been suffering from mesenteric ischemia for several hours when he arrived at the emergency room on the evening of April 30, 2014. Both sides' experts agreed that it is important to treat mesenteric ischemia as early as possible since it is a "life-threatening condition" that may lead to—as it did here—bowel death. Dr. Menges himself testified it was his job to "rule out all current emergent problems" and ensure Lowe was stable before sending him home.

After examining Lowe and reviewing his medical history, Dr. Menges ordered an abdominal CT scan without contrast. Radiologist Dr. David Knight interpreted the scan and reported that it showed the presence of gas "extend[ing] out into the periphery of the liver raising concern for portal venous gas." At trial, Dr. Menges agreed with Dr. Knight and Lowe's experts' testimony that portal venous gas may be a sign of mesenteric ischemia. Dr. Knight recommended to Dr. Menges that he order an ultrasound to determine whether the gas in the liver was "for sure" portal venous gas. Dr. Knight testified that his report "d[id] not rule out portal venous gas in any way." He also testified that portal venous gas is not a precursor to mesenteric ischemia, but that the gas is produced *following* the development of the ischemia, so when such gas is seen, "you have to rule out mesenteric ischemia," as "it can be a life-threatening finding." Dr. Knight stated that when the bowel becomes ischemic, the gas in the lumen of the bowel sometimes invades the bowel wall and "gets picked up by the portal venous system and travels to the liver."

6

The jury also heard testimony that Dr. Menges was confronted with other indications that Lowe had mesenteric ischemia. Lowe had abdominal "pain out of proportion to examination" after eating, which Lowe's expert Dr. Paul Collier testified was "the hallmark of mesenteric ischemia." And Dr. Menges reviewed Lowe's extensive medical history which contained numerous risk factors for mesenteric ischemia, including peripheral vascular disease; atherosclerosis; hyperlipidemia; and having undergone coronary bypass surgery and the placement of cardiac and iliac stents. Dr. Matthews testified that "mesenteric ischemia can occur particularly if the patient is at risk for [vascular disease]."

Nevertheless, in the early morning hours of May 1, 2014, Dr. Menges discharged Lowe home with instructions to call to schedule an ultrasound on an outpatient basis. At this point, Dr. Matthews opined, no permanent damage had likely been done, but in the days following the discharge, the ischemia developed unabated and unobserved until it destroyed nearly half of Lowe's bowel requiring several surgeries and resulting in a lifetime of needed care. Dr. Collier stated that "by sending him home, he ended up infarcting his bowel or having his bowel die."

We find that in light of this evidence, the jury could reasonably have concluded that but for Dr. Menges's negligence, the hospital medical staff would likely have observed the progression of Lowe's mesenteric ischemia, made an accurate diagnosis, and treated it before such catastrophic damage resulted to Lowe's bowel. The jury did not have to speculate that Dr. Menges caused Lowe's injuries—rather, there was substantial evidence to support that finding.

B.      The submissible case against Dr. Cassat.

We next turn to Dr. Cassat's claim that he owed no duty of care to Lowe because he and Lowe did not have a physician-patient relationship. We disagree. We find that Dr. Cassat, as the on-call physician for Lowe's emergency room treatment, owed Lowe a duty of care based on his

7

contractual obligation as an employee of Mercy Clinic to provide assistance in the diagnosis and treatment of emergency room patients while on call.

A physician's duty of care to a patient is generally derived from the physician-patient relationship. *Millard v. Corrado*, 14 S.W.3d 42, 46-47 (Mo.App.E.D. 1999). The law defines a physician-patient relationship as a consensual relationship where the patient or someone acting on the patient's behalf knowingly employs a physician who consents to treat the patient. *Id.* at 49. Where a consulting physician does not physically examine or bill the patient, a physician-patient relationship can still arise where the physician is contractually obligated to provide assistance in the patient's diagnosis or treatment and does so. *Corbet v. McKinney*, 980 S.W.2d 166, 169 (Mo.App.E.D. 1998).

Here, Dr. Cassat had the contractual obligation to participate in Lowe's diagnosis or treatment, and he undertook to do so. Dr. Cassat testified that as a condition of his employment at Mercy Clinic, he served as the surgeon on call for the emergency room generally one night per week. Moreover, hospital policy required him to live within 20 minutes of the hospital so that while on call he would be able to go to the hospital if necessary. This is the sort of contractual obligation this Court considered in *Corbet* that would support a finding that an on-call physician was subject to liability. *Id.* at 169-70 (citing *Fought v. Solce*, 821 S.W.2d 218, 220 (Tex.App. 1991)).

Dr. Cassat testified that emergency room patients are treated using a "team approach" where "everyone," including the on-call surgeon, "has input into the care and treatment of that patient." He admitted that he would have traveled to the hospital to see Lowe if in his view Lowe had exhibited concerning findings. In short, it is undisputed that Dr. Cassat participated in the

8

diagnosis and treatment of Lowe by taking Dr. Menges's call, discussing Lowe's condition, and recommending that Dr. Menges order an outpatient ultrasound.

We acknowledge Dr. Cassat's policy argument that informal consultation between physicians regarding a patient is important and valuable and that finding a formal physician-patient relationship existed solely on the basis of an informal consultation among professional colleagues might have a chilling effect on such beneficial communications. But that is not this case. Here, Dr. Cassat was on call and had the contractual obligation to take Dr. Menges's call and participate in Lowe's care. In fact, the decision to discharge Lowe was based in part on Dr. Cassat's advice to Dr. Menges.

We find therefore that there was ample support in the record that Dr. Cassat and Lowe had a physician-patient relationship giving rise to the duty of care Dr. Cassat owed Lowe in connection with his medical treatment.

II. *The trial court did not err in submitting the verdict-directing instructions as to both doctors.*

Both doctors raise claims of instructional error challenging the verdict-directing instructions. We first address Dr. Menges's assertion that Instruction 7, the verdict director addressing his alleged negligence, was erroneously submitted.

A. There was no error in the submission of Instruction 7, the verdict-directing instruction as to Dr. Menges.

Instruction 7 directed as follows:

In your verdict, you must assess a percentage of fault to defendants Bryan Menges, D.O. and Mercy, whether or not, plaintiff Vincent Lowe or James Cassat, M.D. was partly at fault, if you believe:

First, defendants Bryan Menges, D.O. and Mercy, either:

1) failed to order an inpatient ultrasound, or
2) failed to rule out mesenteric ischemia, or

9

3) discharged plaintiff Vincent Lowe home and

Second, defendants Bryan Menges, D.O. and Mercy, in any one or more of the respects submitted in paragraph First, were thereby negligent, and

Third, such negligence directly caused or directly contributed to cause damage to plaintiff.

Dr. Menges contends Instruction 7 was erroneously submitted because (1) there was not substantial evidence that his failure to order an inpatient ultrasound violated the standard of care and caused Lowe's injuries; (2) the use of the phrase "rule out" created a roving commission; and (3) there was not substantial evidence that Dr. Menges's discharge of Lowe violated the standard of care and caused his injuries. We find no reversible error.

Whether the jury was instructed properly is a question of law, which we review *de novo*. *Ross-Paige v. Saint Louis Metro. Police Dept.*, 492 S.W.3d 164, 172 (Mo.banc 2016) (citing *Templemire v. W & M Welding, Inc.*, 433 S.W.3d 371, 376 (Mo.banc 2014)). In so doing, we view the record in the light most favorable to the submission of the challenged instructions. *Id.* (citing *Stevens v. Markirk Constr., Inc.*, 454 S.W.3d 875, 880 (Mo.banc 2015)). And if we find that by some theory the instructions are supportable, then their submission was proper. *Bach v. Winfield-Foley Fire Protection Dist.*, 257 S.W.3d 605, 608 (Mo.banc 2008); *see also Patton v. May Dept. Stores Co.*, 762 S.W.2d 38, 42 (Mo.banc 1988) (holding that a party is entitled to an instruction on any theory supported by the evidence).

"Substantial evidence is evidence which, if true, is probative of the issues and from which the jury can decide the case." *Hayes v. Price*, 313 S.W.3d 645, 650 (Mo.banc 2010) (quoting *Powderly v. S. Cty. Anesthesia Assocs., Ltd.*, 245 S.W.3d 267, 276 (Mo.App.E.D.2008)). In the case of a disjunctive instruction, each submission must be supported by substantial evidence. *Berra v. Union Elec. Co.*, 803 S.W.2d 188, 190 (Mo.App.E.D. 1991). There is no requirement,

10

however, that each disjunctive be supported by independent, or different evidence. *See, e.g.,* *Stewart v. Sioux City & New Orleans Barge Lines, Inc.*, 431 S.W.2d 205, 209 (Mo.banc 1968) (finding each of two disjunctive theories of recovery, negligence and unseaworthiness of a vessel, was supported by substantial evidence of the condition of the cables on a boat's deck).

Additionally, to demonstrate reversible error, the party challenging an instruction must show that the offending instruction misdirected, misled, or confused the jury, resulting in prejudice to that party. *Ross-Paige*, 492 S.W.3d at 172 (citing *Hervey v. Mo. Dept. of Corrections*, 379 S.W.3d 156, 159 (Mo.banc 2012)). Prejudice results only from error that "materially affects the merits of the action." *Bach*, 257 S.W.3d at 608.

1. *There was substantial evidence that Dr. Menges's failure to order an inpatient ultrasound violated the standard of care and caused or contributed to cause Lowe's injuries.*

The jury heard expert testimony on multiple occasions that Dr. Menges should have ordered an *inpatient* ultrasound as opposed to an *outpatient* ultrasound, because the order for the outpatient ultrasound failed to ensure timely intervention to prevent bowel death. Dr. Matthews testified that "[i]f you've got a suspicion for [mesenteric ischemia], you have to go look for it." Indeed, the decision to order an outpatient as opposed to an inpatient ultrasound was cited in the experts' testimony repeatedly as one of Dr. Menges's acts or omissions that caused Lowe to be misdiagnosed and to sustain damage to his bowel.

Dr. Matthews testified that Dr. Menges's decision whether to order an inpatient or outpatient ultrasound made the difference in determining whether something could be done about Lowe's mesenteric ischemia. He stated that portal venous gas does not remain in the liver long-term—that the "bubbles of gas" that are in the portal vein will "eventually be absorbed and eventually might be 24 hours, 48 hours" from when they first appeared—and since the purpose of

11

the ultrasound recommended by Dr. Knight and Dr. Cassat was to determine the character of the gas that showed on the CT scan, ordering an outpatient ultrasound made it less likely that the doctors would be able to identify the gas and timely diagnose and treat Lowe's mesenteric ischemia. Dr. Matthews testified that Lowe's chances of getting an outpatient ultrasound performed within 24 hours of his discharge from the emergency room were "zero. That's why he should have been kept to get it done."

Dr. Matthews also opined that if, by contrast, Dr. Menges had ordered an inpatient ultrasound, it "probably would have been done . . . five or six hours later," and by that time it was his "strong opinion within a much greater than reasonable degree of medical certainty that [Lowe] would have had increased findings [for mesenteric ischemia]. He would have still had his pain. And [at] that point more likely than not, he would have also had an elevation of his white count and a lot of things would have been happening" to raise sufficient concern for mesenteric ischemia to timely diagnose and treat it.

Turning to whether the jury was able in light of this evidence to understand the first disjunctive of Instruction 7, we find there was no risk of jury confusion here—Lowe's counsel explained in closing argument how Dr. Menges's failure to order an inpatient ultrasound was negligent and led to Lowe's injuries: "Air was found in his liver. That is not normal. You don't send somebody home with air in their liver and tell them to come back the next day for an ultrasound." Accordingly, the trial court did not err in submitting the theory that Dr. Menges's failure to order an inpatient ultrasound violated the standard of care and caused Lowe's injuries.

2.    *Use of the phrase "rule out" did not create a roving commission.*

We find that the phrase "rule out" in the second subpart of Instruction 7 did not create a roving commission. "Where an instruction submits a question to the jury in a broad, abstract way

12

without being limited to any issues of fact or law developed in the case, it may be considered a 'roving commission.'" *McNeill v. City of Kansas City*, 372 S.W.3d 906, 910 (Mo.App.W.D. 2012). However, where, as here, "the testimony presented at trial sufficiently explained and thereby gave meaning to the language of the verdict director, the instruction is not a roving commission." *Bell v. Redjal*, 569 S.W.3d 70, 95 (Mo.App.E.D. 2019) (citing *Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 767 (Mo.banc 2010)); *see also Williams v. Mercy Clinic Springfield Communities*, 568 S.W.3d 396, 413 (Mo.banc 2019) ("When determining whether a roving commission occurred, a jury instruction should be considered in the context of the trial as a whole.").

In this case, seven of the eight physicians who testified at trial gave meaning to the phrase "rule out" as used in this verdict director. Dr. Matthews testified that Dr. Menges's failure to "rule out" mesenteric ischemia was the result of his failure—despite signs Lowe was suffering from that condition, including the presence of gas in the periphery of his liver—to keep Lowe in the emergency room for further observation or reevaluation, or to conduct any of various tests (including an inpatient ultrasound and an angiography) he could have performed to exclude mesenteric ischemia as a diagnosis. And Dr. Menges himself testified that "ruling out" involves eliminating from a patient's list of likely diagnoses any life-threatening conditions and thus "stabiliz[ing] the patient before sending him home." Moreover, the radiologist Dr. Knight testified that the sole test Dr. Menges ordered, the non-contrast CT, "d[id] not rule out portal venous gas in any way." In light of all this evidence, the phrase "rule out" was well-defined here and there was no risk of jury confusion. Thus, Instruction 7 did not create a roving commission.

13

3. *There was substantial evidence that Dr. Menges's discharge of Lowe violated the standard of care and caused or contributed to cause his injuries.*

We also find no merit in Dr. Menges's third and final attack on Instruction 7 that there was not substantial evidence that discharging Lowe violated the standard of care and caused his injuries. Lowe's experts' testimony supported this submission to the jury. Dr. Matthews testified on multiple occasions that his "primary criticism" of Dr. Menges's care was that despite concerning findings, he sent Lowe home—specifically, that "the discharge, period, was a deviation from the standard of care" and Lowe "would have been much better" had he been kept in the hospital. Moreover, as noted above, Dr. Collier testified that "by sending [Lowe] home, he ended up infarcting his bowel or having his bowel die."

Nevertheless, Dr. Menges discounts this testimony by essentially arguing that the submission of Instruction 7 was erroneous unless there was evidence that his discharge of Lowe, *considered in a vacuum and separate from any other facts and circumstances*, was negligent and caused Lowe's injuries. But that is not the applicable standard and Dr. Menges cites no authority for applying it here; rather, "[a] party is entitled to an instruction on any theory supported by the evidence." *Ploch v. Hamai*, 213 S.W.3d 135, 140 (Mo.App.E.D. 2006). And while we acknowledge that for a disjunctive verdict-directing instruction such as Instruction 7 to be deemed appropriate, every alternative must be supported by *substantial* evidence, *Ross-Paige v. Saint Louis Metro. Police Dept.*, 492 S.W.3d 164, 172 (Mo.banc 2016), there is no additional requirement in Missouri law that each alternative be supported by *distinct* evidence.[5]

---

[5] The Missouri Supreme Court has already implicitly rejected this unfounded rule proposed by Dr. Menges, cautioning that just "[b]ecause subparts of a jury instruction might causally contribute to the same damages does not necessarily mean each subpart is not supported by substantial evidence." *Williams v. Mercy Clinic Springfield Communities*, 568 S.W.3d 396, 415 (Mo.banc 2019). Put simply, where—as here—alternatives in a disjunctive jury instruction might all fairly

14

B.    We decline to review Dr. Cassat's unpreserved challenge to Instruction 9.

For his part, Dr. Cassat challenges the submission of Instruction 9, the verdict director for Lowe's claims of negligence against him.  The instruction was premised in part on Dr. Cassat's failure to order an inpatient ultrasound, and Dr. Cassat contends on appeal that Lowe "failed to provide substantial evidence that [his] alleged failure to order an inpatient ultrasound caused his injuries."

Because we find Dr. Cassat has failed to preserve this claim of instructional error, since he did not timely present it to the trial court, we decline to review it.  At trial, Dr. Cassat's sole objection to this part of Instruction 9 prior to its submission was as follows: "There was no competent evidence whatsoever that the standard of care required Dr. Cassat to order an inpatient ultrasound prior to discharge.  There was never any testimony given along those lines."  But now on appeal, Dr. Cassat asserts a different basis—that Lowe failed to adduce substantial evidence on causation with respect to Dr. Cassat's failure to order an inpatient ultrasound.

If on appeal an alleged error relating to an instruction differs from or is not included in the specific objections made to and determined by the trial court, it may not be reviewed by the appellate court.  *Wilson v. Kaufmann*, 847 S.W.2d 840, 846-47 (Mo.App.E.D. 1992); *see also Goralnik v. United Fire & Cas. Co.*, 240 S.W.3d 203, 210 (Mo.App.E.D. 2007) (holding "a point on appeal may not enlarge or change the objection made at trial").  Moreover, the directions of Rule 70.03[6] are clear:

> Counsel shall make *specific objections* to instructions considered erroneous.  No party may assign as error the giving or failure to give instructions unless that party objects thereto

---

be considered part of the same causal chain, they may still be submitted to the jury and will not be found unsupported solely because, as causally-linked actions, they inevitably involve some of the same underlying facts.

[6] All rules references are to the Missouri Supreme Court Rules (2016).

15

*before the jury retires to consider its verdict,* stating *distinctly* the matter objected to and the grounds of the objection.

(emphasis added). Rule 70.03 was designed to prevent retrial for instructional error that was not brought to the trial court's attention prior to submission. *Hatch v. V.P. Fair Found., Inc.*, 990 S.W.2d 126, 140 (Mo.App.E.D. 1999).

Put simply, here Dr. Cassat asserts on appeal a different objection to the Instruction 9 than any he presented to the trial court prior to the submission of that instruction. The objection at trial, that there was no competent evidence the *standard of care* required Dr. Cassat to order an inpatient ultrasound prior to discharge, is not the same as the one asserted here that Lowe "failed to provide substantial evidence that Dr. Cassat's alleged failure to order an inpatient ultrasound *caused* his injuries." (emphasis added). Dr. Cassat is not entitled to review of a different, untimely-raised claim of instructional error. *See Goralnik*, 240 S.W.3d at 210 (citing Rule 70.03). Point denied.

III. *The trial court did not err by refusing to grant a mistrial or by admitting the testimony of Dr. Matthews, Lowe's medical expert on Dr. Menges's care.*

Dr. Menges submits that Dr. Matthews's testimony criticizing him for failing to order a CT scan with contrast was irrelevant and so prejudicial as to require a mistrial because Dr. Matthews did not claim that omission itself marked a violation of the standard of care.

A mistrial is a drastic remedy and the decision to grant or deny such relief lies in the sound discretion of the trial court. *Spence v. BNSF Ry. Co.*, 547 S.W.3d 769, 780 (Mo.banc 2018). Likewise, the admission or exclusion of expert testimony is a matter of trial court discretion. *Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 760 (Mo.banc 2010). Given these deferential standards, and considering all the facts on this record, we find no reversible error.[7]

---

[7] Dr. Menges seems to suggest that the trial court could not, without abusing its discretion, change its mind about whether Dr. Matthews's testimony was inadmissible, since it had made a *pretrial* ruling granting their motion in limine asking to exclude "testimony of 'criticisms' that do not rise

Here, Dr. Menges complains of Dr. Matthews's testimony that while "[i]t was not a deviation from the standard of care" to order, as Dr. Menges did, a CT *without* contrast, Dr. Matthews believed that "[g]iven [Lowe's] presentation, . . . a *contrast* CT was more indicated" and might have helped Dr. Menges meet the standard of care here. (emphasis added). This testimony was relevant and admissible for the purpose of explaining how, even if a "contrast CT" was not required, by ordering such a test Dr. Menges might have avoided violating the standard of care *in the manner submitted to the jury in two of Lowe's theories of his negligence*: (1) by failing to rule out mesenteric ischemia, and (2) by discharging Lowe under the circumstances here. *Cf. Klaus v. Deen*, 883 S.W.2d 904, 905-08 (Mo.App.E.D. 1994) (en banc) (finding that even where it was not pleaded that doctor was negligent for failing to order a CT scan, evidence was admissible of such failure—and that it was negligent—because it was "relevant to an issue before the jury," namely whether doctor failed to meet the standard of care in a related manner).

Without question the testimony "tended to prove or disprove [these] fact[s] in issue." *Brown v. Hamid*, 856 S.W.2d 51, 56 (Mo.banc 2007) (defining "the test for relevancy"). Dr. Matthews indicated that if ordered, a contrast CT among other tests would have helped Dr. Menges rule out mesenteric ischemia, or else would have signaled to him not to discharge Lowe, but that Dr. Menges instead sent Lowe home after performing only a non-contrast CT. Dr. Matthews testified that the non-contrast CT was merely "a start" toward meeting the standard of care because it "will not demonstrate very well whether the small bowel is involved, is thickened." In light of these facts, the record refutes Dr. Menges's argument that Dr. Matthews's criticisms of his failure

to the level of negligence."[1] We find such an argument has no merit. Any pretrial ruling considering the admissibility of evidence is *interlocutory only* and additional information produced at trial may convince the trial court to alter its pretrial ruling. *State ex rel. Tipler v. Gardner*, 506 S.W.3d 922, 928 (Mo.banc 2017); *see also Elliott v. State*, 215 S.W.3d 88, 92 (Mo.banc 2007) ("A ruling in limine is interlocutory only and is subject to change during the course of the trial.").

17

to order a CT scan with contrast had no relevance unless he testified that omission *itself* violated the standard of care. We conclude that the court did not err in failing to strike Dr. Matthews's testimony in this regard or in failing to grant a mistrial.

IV. *The trial court did not err by admitting into evidence Lowe's life care plan or the testimony of his life care planner.*

Lowe adduced the testimony of Jan Klosterman, an expert in life care planning, to establish his life expectancy and the cost of his future medical needs. The life care plan she produced for Lowe was admitted into evidence. The doctors raise three claims of error in connection with the admission of Ms. Klosterman's testimony and the life care plan.

A. Ms. Klosterman's testimony and the life care plan did not violate § 490.715.

Dr. Menges's first contention is that Ms. Klosterman's testimony and the life care plan violated the dictates of § 490.715, RSMo 2017. Dr. Menges asserts that this statute precluded Ms. Klosterman from projecting future medical costs based on the amounts Lowe will be *charged* for his care. We reject this argument for two reasons. First, this Court recently held § 490.715 "does not preclude evidence of the amount charged," so Dr. Menges's assertion fails on its face. *Brancati v. Bi-State Dev. Agency*, 571 S.W.3d 625, 635 (Mo.App.E.D. 2018). Second, we are dubious that § 490.715 even applies to evidence of *projected future amounts charged*, since the statute by its plain language—as a codification of the common-law collateral source rule—is concerned solely with evidence of amounts *already charged or paid*.[8] Our Supreme Court has observed that "[t]he

---

[8] Section 490.715, the text of which is provided below, is manifestly directed at the admissibility of evidence of collateral source payments already made, not the permissible methods of proving future damages not yet paid by anyone:

> Damages paid by defendant prior to trial may be introduced but is waiver of credit against judgment — evidence of medical treatment rendered permitted, when (collateral source rule modified). — 1. No evidence of collateral sources shall be admissible other than such evidence provided for in this section.

18

statute at issue . . . codifies the common law collateral source rule and modifies it in certain respects." *Deck v. Teasley*, 322 S.W.3d 536, 538 (Mo.banc 2010). "The common law collateral source rule is an exception to the rule that tort damages are only compensatory." *Id.* (citing *Smith v. Shaw*, 159 S.W.3d 830, 832 (Mo.banc 2005)). "Specifically, the rule prevents a *tortfeasor* from reducing his or her liability to a plaintiff by proving that payments *were made to the plaintiff* by a collateral source." *Id.* (emphasis added). In short, § 490.715 provides Dr. Menges no relief because we find it does not apply to the admissibility of evidence of future medical charges that, by definition, have yet to occur.

---

2. If prior to trial a defendant or his or her insurer or authorized representative, or any combination of them, pays all or any part of a plaintiff's special damages, the defendant may introduce evidence that some other person other than the plaintiff has paid those amounts. The evidence shall not identify any person having made such payments.

3. If a defendant introduces evidence described in subsection 2 of this section, such introduction shall constitute a waiver of any right to a credit against a judgment pursuant to section 490.710.

4. This section does not require the exclusion of evidence admissible for another proper purpose.

5. (1) Parties may introduce evidence of the value of the medical treatment rendered to a party that was reasonable, necessary, and a proximate result of the negligence of any party.

(2) In determining the value of the medical treatment rendered, there shall be a rebuttable presumption that the dollar amount necessary to satisfy the financial obligation to the health care provider represents the value of the medical treatment rendered. Upon motion of any party, the court may determine, outside the hearing of the jury, the value of the medical treatment rendered based upon additional evidence, including but not limited to:

(a) The medical bills incurred by a party;

(b) The amount actually paid for medical treatment rendered to a party;

(c) The amount or estimate of the amount of medical bills not paid which such party is obligated to pay to any entity in the event of a recovery.

Notwithstanding the foregoing, no evidence of collateral sources shall be made known to the jury in presenting the evidence of the value of the medical treatment rendered.

19

B.     Ms. Klosterman had adequate foundation to project Lowe's medical needs.

Next, both doctors contend Ms. Klosterman lacked adequate foundation to project that Lowe would require Gattex and Total Parenteral Nutrition ("TPN") for the rest of his life.[9] We disagree for two reasons. First, the record shows Ms. Klosterman's projection of Lowe's future medical costs was properly based on the undisputed permanent nature of Lowe's medical condition and on the expert medical opinion of Dr. Deborah Rubin, Lowe's treating gastroenterologist. Lowe lost over seven feet of his lower intestine—an obviously permanent condition—resulting in the diagnosis of short bowel syndrome, a malady marked by the intestines' inability to absorb sufficient nutrition for Lowe's survival. And while Dr. Rubin testified that it was her goal to try to wean Lowe from Gattex and TPN, she was unable to opine when in the future Lowe was likely to no longer need those treatments and at the time of trial, Lowe was in fact taking Gattex and TPN with no discernible end date.[10]

The doctors' argument essentially attacks the submissibility of Lowe's future medical damages in connection with his ongoing need for Gattex and TPN. Here, Instruction 13, derived from MAI 21.05, defined "future medical damages" to the jury as "those damages arising in the future for medical expenses such as necessary drugs, therapy, and medical, surgical, nursing, X-ray, and other health and rehabilitative services." To support the award of future damages, Lowe had to adduce competent medical evidence demonstrating that the future physical conditions that are the basis for the damages stem from the original injury and will occur. *Brooks v. SSM Health*

---

[9] Gattex is a drug to promote cell growth in Lowe's intestines, and TPN is an intravenous food supplement to make up for Lowe's malnutrition due to his short bowel syndrome.

[10] The parties do not dispute that Ms. Klosterman, although not a medical doctor herself, could rely on the medical opinion testimony of another, and on medical records, to form an opinion about the nature and extent of Lowe's present injuries with reference to anticipated future care and treatment.

20

*Care*, 73 S.W.3d 686, 698 (Mo.App.S.D. 2002). We find that Lowe carried his burden here. He was on these treatments at the time of trial for the permanent injuries he suffered and his treating gastroenterologist was unable to say if or when he could stop them. In this regard, Lowe's circumstances are different from the numerous reported cases in which recovery is sought for probable or possible future medical treatment where the patient is *not currently* undergoing the treatment but might in the future and the jury is asked with the assistance of expert testimony to assess the extent and nature of the plaintiff's present injuries with reference to the value or cost of such possible future treatment. *See, e.g., Swartz v. Gale Webb Transp. Co.*, 215 S.W.3d 127, 131 (Mo.banc 2007) (plaintiff merely "at risk" of requiring future surgery); *Emery v. Wal-Mart Stores, Inc.*, 976 S.W.2d 439, 447 (Mo.banc 1998) (plaintiff with possible need for future surgery); *Breeding v. Dodson Trailer Repair, Inc.*, 679 S.W.2d 281, 283-84 (Mo.banc 1984) (plaintiff's need for future surgery contingent on failure of more conservative treatment).

We conclude that Dr. Rubin's testimony provided sufficient foundation for the jury to conclude that Lowe would likely need Gattex and TPN for the rest of his life and thus sufficient foundation for Ms. Klosterman to opine as to the future cost of such treatment.

There is a second basis justifying the admission of the life care plan and Ms. Klosterman's supporting testimony on the issue of Lowe's future need for Gattex and TPN. Taken as a whole, Dr. Rubin's testimony supported the finding that Lowe was at an increased risk of needing this care for the rest of his life and Missouri courts have long held that expert testimony to a reasonable degree of certainty that a defendant's conduct placed the plaintiff at an *increased risk* of suffering possible *future consequences*—here, needing to stay on Gattex and TPN for life—is admissible to aid the jury in assessing the extent of the plaintiff's *present injuries*, even if those future consequences are *not* reasonably certain to occur. *Swartz*, 215 S.W.3d at 131 (citing *Bynote v.*

21

*National Super Markets, Inc.*, 891 S.W.2d 117, 125 (Mo.banc 1995); *Stephens v. Guffey*, 409 S.W.2d 62, 70 (Mo.banc 1966)).[11]

Indeed, "under Missouri case law, expert testimony is admissible where it *addresses the probability, short of reasonable certainty*, that future treatment *may* be necessary and of the *potential* cost of such treatment." *Wiley v. Homfeld*, 307 S.W.3d 145, 153 (Mo.App.W.D. 2009) (emphasis added) (citing *Swartz*, 215 S.W.3d at 131) (holding that where medical expert "could not testify with certainty how much treatment [plaintiff] would ultimately require," expert's testimony was nevertheless admissible "describ[ing] the various forms of treatment that might be required and the costs associated therewith"), overruled on other grounds by *Badahman v. Catering St. Louis*, 395 S.W.3d 29, 40 (Mo.banc 2013). In *Swartz*, for example, our Supreme Court found that "testimony regarding [the plaintiff's] increased risk of future harm was admissible . . . . information the jury should have in the difficult task of trying to give plaintiff's condition a dollar value" where there was evidence "that her back injury carrie[d] with it at least a 25 percent chance, and perhaps a 50 percent chance, of requiring surgery in the future." 215 S.W.3d at 132-33.

Here, similarly, Dr. Rubin testified that Lowe has shown difficulty going below three times per week of TPN; that he may never be able to wean from TPN completely; and that "as of now the patients [on Gattex] will continue to maintain even when they are off of their parenteral

---

[11] We note also that the jury has never been limited in an "increased risk" case to valuing the portion of the plaintiff's present injuries owing to the increased risk of future consequences at no greater a percentage of the potential cost of those consequences than their chance of occurrence. That is because the jury values the plaintiff's present injuries, including any increased risk of future complications, but does not value the cost of those potential complications as such. *Swartz*, 215 S.W.3d at 130. Also, "a jury is free to believe any, all, or none of a witness's testimony," *Mitchell v. Kardesch*, 313 S.W.3d 667, 675 (Mo.banc 2010), and so may provide in full for contingencies supported by the evidence and not merely invented based on speculation.

22

nutrition." Therefore, Ms. Klosterman had adequate foundation to project—based on Dr. Rubin's testimony to a reasonable degree of medical certainty that Lowe's injuries created a substantially increased risk—that Lowe would continue to need Gattex and TPN for the rest of his life.

     C.     <u>Ms. Klosterman had adequate foundation to project Lowe's life expectancy.</u>

Dr. Cassat argues that Ms. Klosterman lacked adequate foundation to base Lowe's life care plan on a life expectancy of 25.7 years. On the contrary, Ms. Klosterman's 25.7-year projection was properly based on the mortality tables of the 2016 National Vital Statistics Report, which was before the jury after the court took judicial notice of it. "Mortality tables are included in those facts required to be judicially noticed because they are considered of universal common knowledge." *Jackson v. Cherokee Drug Co.*, 434 S.W.2d 257, 264 (Mo.App. 1968) (citing *Hohlstein v. St. Louis Roofing Co.*, 42 S.W.2d 573, 576 (Mo.banc 1931)). These tables are "customarily admitted to show the probable duration of the life of the injured plaintiff" and "cannot be rejected because of sharp variances in the hazards of life among various persons." *Dorsey v. Muilenburg*, 345 S.W.2d 134, 142 (Mo.banc 1961). "Such matters are generally considered as going to the probative effect of the evidence, and not to its admissibility." *Id.* Indeed, while "the probative value of the mortality tables may be weakened, and even, perhaps, in some cases, destroyed by evidence of ill-health or disease of the person whose life expectancy is in issue[,] such matters may properly be considered by the jury in weighing the testimony, [as] they do not render it incompetent." *Id.*; *see also Sampson v. Mo. Pac. R. Co.*, 560 S.W.2d 573, 585-86 (Mo.banc 1978) (reaffirming *Dorsey*); *Guthrie by and through Herring v. Mo. Methodist Hosp.*, 706 S.W.2d 938, 943 (Mo.App.W.D. 1986) (applying the stated principles from *Dorsey*). Therefore, Ms. Klosterman had adequate foundation here to base Lowe's life care plan on a life expectancy of 25.7 years.

23

V. *The portion of the judgment pertaining to the periodic payment of future medical damages and to attorney's fees must be reversed.*

We now turn to the trial court's damages award. We find the court's judgment in this regard requires reversal and remand for two reasons.

A. The trial court failed to adhere to § 538.220.2's mandatory formula for calculating the amounts of periodic future damages payments.

After the doctors invoked § 538.220.2 by requesting that the amount assessed by the jury as future damages be paid in whole or in part in subsequent periodic installments, the trial court was required to follow the dictates of that statute. Section 538.220.2 provides the amounts of any periodic future medical damages payments are to be determined by "dividing the total amount of future medical damages by the number of future medical periodic payments." The Missouri Supreme Court has interpreted this language as an unambiguous directive, meant to establish a schedule of *unvarying, equal* payments. *Watts v. Lester E. Cox Med. Ctrs.*, 376 S.W.3d 633, 647 (Mo.banc 2012) (observing § 538.220.2 "requires that [periodic future medical damages] payments be spread out in equal payments over the recipient's life expectancy [and] takes from the court . . . the opportunity to agree upon a different . . . payment schedule").

Here, however, the trial court ordered the future damages to be paid in *varying, unequal* annual amounts, which plainly violates § 538.220.2 and requires reversal and remand with directions that the court reapply the statute and recalculate the future damages it determines should be paid in periodic installments. It was indisputably within the trial court's "authority to determine what part of the future medical damages shall be subject to the payment schedule." *Id.* For example, the court had discretion, and will retain such on remand, to order a larger or smaller immediate lump sum payment to account for Lowe's particular medical needs with the remainder of the future damages to be paid out periodically in the future. *Id.* However, once the court

determined how much of Lowe's future damages would be paid out in future periodic payments, under § 538.220.2 those payments were required to be equal. *Id.*

> B.     The trial court erred by failing to award Lowe a lump sum sufficient to pay his attorney's fees as required by § 538.220.4.

While the Missouri Supreme Court has confirmed that "[t]he provisions of § 538.220 give the circuit court . . . discretion in establishing [a] plan for future payments," that discretion comes with two exceptions: "First, all past damages must be paid in a lump sum at the time of judgment. § 538.220.1. Second, it is presumed that, absent the attorney's agreement, attorney's contingent fees will be paid at the time of judgment. § 538.220.4." *Vincent by Vincent v. Johnson*, 833 S.W.2d 859, 866 (Mo.banc 1992). Thus, because here the trial court was timely informed that Lowe had a contingency fee arrangement with his attorneys,[12] the court was required to order the immediate payment of a lump sum sufficient to cover Lowe's attorney's fees. *Id.* Otherwise § 538.220.4 would cease to be the "exception" to the trial court's discretion in establishing a plan for future payments that our Supreme Court identified in *Vincent. Id.*

In light of this requirement, we find that the trial court misapplied the law and committed reversible error.[13] The court awarded Lowe a lump sum of only $2,470,990, which was the exact

---

[12] Lowe represented in his proposed amended judgment that he had a contingency fee arrangement entitling them to "40% of net to Plaintiff." He requested that the court order this amount be paid immediately in a lump sum along with his past damages, arguing in support that "[u]nder § 538.220.1, past damages shall be payable in a lump sum and under § 538.220.4, if the Plaintiff and his attorney have agreed on a contingency fee, it shall be presumed that the fee will be paid at the time the judgment becomes final." In light of these facts, we find Lowe timely informed the court of the contingency fee arrangement and should have been afforded the benefit of the presumption, as it was unrebutted by any evidence of an alternative arrangement.

[13] In his point relied on related to attorney's fees, Lowe also asserts the trial court violated § 538.220.4 by failing to award his attorney's *expenses* in a lump sum. However, Lowe makes no substantive argument to support this claim, and this Court has held that § 538.220 "is silent as to expenses." *Baker v. Guzon*, 950 S.W.2d 635, 648 (Mo.App.E.D. 1997). In any event, then, we find no reversible error on this ground, but note solely for purposes of clarity on remand the *Baker* court's holding that it is generally within a trial court's discretion to "order expenses to be deducted

25

amount the jury had awarded Lowe for his past damages, and which was required to be paid in a lump sum pursuant to § 538.220.1. However, this amount was less than half that needed to cover his attorney's fees which amounted to $5,128,396.

This case is distinguishable from our Supreme Court's recent holding in *Williams v. Clinic Springfield Communities*, 568 S.W.3d 396, 410 (Mo.banc 2019). In *Williams*, the Court held that since "[§ 538.220.4] does not require the circuit court to address the payment of attorney's fees," it was not error for the judgment to be "silent as to the payment of attorney's fees" in the particular circumstance "when the lump sum [was] large enough to cover the fees." *Id.* The Court did not, as Dr. Menges suggests, jettison § 538.220.4's presumption that attorney's fees will be paid at the time of the judgment—rather, it found no error precisely because, under the circumstances in *Williams*, "[the plaintiff's] lump sum award [was] more than enough to cover the attorney's fees at the time of judgment." *Id.* at 410-11.

Here, unlike *Williams*, the lump sum ordered paid in the judgment was insufficient to cover Lowe's attorney's fees. And because § 538.220.4 creates a presumption that attorney's fees shall be paid in a lump sum at the time the judgment becomes final, the trial court erred by failing to award a lump sum sufficient to cover the plaintiff's attorney's fees. *Vincent*, 833 S.W.2d at 866.

To the extent Lowe contends the trial court was *required by § 538.220.4* to award him a lump sum sufficient to pay *both* his attorney's fees *and* all his past damages—which here would total $7,599,386—*Williams* rejected that argument. In *Williams*, the plaintiff made effectively the same claim of error: "[T]he circuit court should have required the attorney's fees to be subtracted from her future medical damages and paid in lump sum at the time of judgment before the circuit

from the future damages award" because they, "like attorney's fees and past damages, would not be incurred in the future." *Id.*

26

court decided how much of the future medical damages were to be subject to periodic payments." 568 S.W.3d at 410. The Supreme Court found, "While the statute is clear there is a presumption attorney's fees will be paid at the time the judgment becomes final, the statute *does not indicate* whether a portion of the fees should be paid in part by deducting them from the amount subject to future periodic payments or whether the fees should be paid in full from the lump sum damages when the lump sum award is large enough to cover the fees." *Id.* (emphasis added). In other words, it is *not* a violation of § 538.220.4, at least, to award a lump sum sufficient to cover only the greater, and not both, of the plaintiff's past damages and attorney's fees. But even so, none of this should be construed to prevent the trial court within its discretion on remand from fixing a lump sum award amount sufficient not only to cover Lowe's attorney's fees and expenses but also to address Lowe's current medical needs.

C.     The application of the fixed interest rate in § 538.220.2 was not erroneous.

Lowe next contends that the application of the fixed interest rate mandated by § 538.220.2 deprived him of the full value of the jury's award and thus violated his constitutional rights. We disagree. While we are again guided by our Supreme Court's recent decision in *Williams v. Clinic Springfield Communities*, 568 S.W.3d 396 (Mo.banc 2019), we find that case to be distinguishable on this point as well.

In *Williams*, our Supreme Court found the application of § 538.220.2 to be unconstitutional where it mandated a substantially lower interest rate than the jury used to discount future medical damages to present value, effectively discounting the jury's award twice. *Id.* at 407-08. The Court held that "when the jury discounts future medical damages to present value, full compensation for those damages requires the use of a *consistent* future damages interest rate." *Id.* at 408 n.8 (citing *Watts v. Lester E. Cox Med. Ctrs.*, 376 S.W.3d 633, 648 (Mo.banc 2012)) (emphasis added). The

27

record in *Williams* demonstrated that the jury discounted future medical damages to present value using an interest rate *substantially greater* than the interest rate mandated by § 538.220.2. *Id.* at 407-08. Specifically, the jury heard expert testimony regarding the amount of money the plaintiff needed to fund her life care plan if the award were to account for the future inflation of medical costs. *Id.* at 407. "One of [the plaintiff's] economic experts testified the per annum interest rates used to calculate the present value figure presented to the jury ranged between .74% and 5.18% over [the plaintiff's] 57-year life expectancy," and "[t]he expert stated that for 55 of the 57 years, an interest rate greater than the statutorily required rate [of 1.2 percent] was used for the calculation of the present value figure." *Id.* at 407 n.5. The Court found that the jury relied upon this expert testimony in determining the future medical award. *Id.* at 407 n.5.

Here, by contrast, the record contains no similar expert testimony or other evidence on which the jury might have relied to discount future medical damages to present value using an interest rate different from that found in § 538.220.2. As a result, there is no basis in the record for us to conclude that the jury used an inconsistent interest rate to the one supplied by the statute: 1.48 percent. And therefore, because we will not speculate to find a constitutional violation where Lowe failed to make a record clearly demonstrating such like in *Williams*, we must reject Lowe's challenge to the trial court's application of the statutory interest rate.

### Conclusion

For the reasons stated above, we reverse and remand the trial court's judgment solely as regards its damages award and affirm in all other respects.

_____
James M. Dowd, Presiding Judge

Colleen Dolan, C. J., and
Gary M. Gaertner, Jr., J., concur.

28